# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE DURA MEDIC HOLDINGS, INC. CONSOLIDATED LITIGATION | ) ) | Cons. C.A. No. 2019-0474-JTL |

## POST-TRIAL OPINION ADDRESSING FIDUCIARY DUTY CLAIMS

Date Submitted: December 19, 2024
Date Decided: January 29, 2025

Raymond J. DiCamillo, Robert L. Burns, Matthew W. Murphy, Kyle H. Lachmund, Sandy Xu, Alfred P. Dillione, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; David L. Barrack, WINSLETT STUDNICKY MCCORMICK & BOMSER LLP, New York, New York; *Counsel for Greg Bailey*; *Karen Lee Bryant*; *Gary Lee Campbell*; *Selle D'Shanna Campbell*; *Robert Chicoine*; *Crown Predator Holdings 1, LLC*; *DM Seller Representative LLC*; *James T. Doody*; *Grant Eckberg*; *Tim Einwechter*; *Jessica Evans*; *Deborah Fedorak*; *Rick Ferreira*; *Fisher Holdings LLC*; *G&D Progressive Services, Inc.*; *Kevin J. Harrington*; *Sherrie Horton*; *Becki Jaynes*; *KLBK Investments, LLC*; *Lewin Investments, LLC*; *Marc Mazur*; *Steven Mintz*; *Steve E. Nelson*; *Don Newton*; *Mark Newton*; *Stephen J. Nicholas, MD*; *George Shelton Ochsner*; *Stephen Ochsner*; *Jason Pauletto*; *Richard A. Danzig Profit Sharing Plan & Trust*; *Martin J. Rucidlo*; *Kim Sauber*; *Gavin Scotti*; *Morton Stayton*; *Steve E. Nelson Trust*; *Symcox Family Limited Partnership*; *Jay Symcox*; *Ellen Walsh*; *WIU Foundation*; *and Edward J. Zecchini.*

David S. Eagle, KLEHR HARRISON HARVEY BRANZBURG LLP, Wilmington, Delaware; Stuart Singer, Carl Goldfarb, BOIES SCHILLER FLEXNER LLP, Fort Lauderdale, Florida; *Counsel for Jonathan Black*; *Maneesh Chawla*; *Comvest Investment Partners Holdings, LLC*; *Dura Medic Holdings, Inc.*; *Dura Medic, Inc.*; *Dura Medic Parent Holdings, LLC*; *and Roger Marrero.*

Steven L. Caponi, Megan E. Hunt, K&L GATES LLP, Wilmington, Delaware; *Counsel for AdaptHealth, LLC, and DM Acquisition Sub LLC.*

**LASTER, V.C.**

A private equity firm acquired a privately held company through a reverse triangular merger. The acquired company performed terribly. Two years later, the private equity firm sold the acquired company's assets to a strategic buyer for one-fifteenth of the purchase price. The private equity firm lost its entire investment. The CEO whom the private equity firm installed likewise lost his entire investment, plus all the money that his friends and family invested.

One of the sellers was the company's co-founder. He rolled over a portion of his merger proceeds and received equity in a holding company two levels above the post-merger company. He asserted derivative claims on behalf of three entities: the company, the first-level holding company, and the second-level holding company.

The co-founder claimed that the officers, directors, and controllers of the post-merger company breached their fiduciary duties by (i) depressing the company's revenue and (ii) harming the company by firing key employees (including himself). The co-founder failed to prove that either alleged breach involved a conflict of interest. The business judgment rule applies, and judgment will be entered in favor of the defendants on those claims.

The co-founder next challenged three self-interested financings, raising both legal and equitable claims. The co-founder partially succeeded on his legal claim by proving that the defendants violated the second-level holding company's LLC agreement when they engaged in one of the financings. The co-founder achieved greater success with his equitable claims. He proved that the entire fairness standard applied to the self-interested financings, and the defendants failed to prove that those

financings were entirely fair. As a remedy, the financings are equitably subordinated to a note that the selling stockholders received as part of the consideration for the merger. Judgment will be entered imposing that form of relief.

The co-founder also challenged the asset sale as a breach of fiduciary duty. The asset sale was an arm's-length end-stage transaction. Enhanced scrutiny therefore applies.

The trial record established that the defendants' actions fell within a range of reasonableness, as did the asset sale itself. The defendants made debatable decisions during the sale process that might have rendered the process unreasonable had conflicted fiduciaries been involved, but the opposite was true. The sell-side private equity firm held a dominant economic position in the company and had every incentive to find the best deal possible. The company's CEO led the sale process, and he had invested millions of dollars of his own money and his family's. He too had every incentive to find the best deal possible. Perhaps they could have done a better job selling a distressed asset that could no longer operate as a going concern. That, however, is not the standard. Judgment will be entered for the defendants on that claim.

The seller representative also brought claims challenging the asset sale. The seller representative failed to prove that the asset sale constituted a fraudulent

transfer. The company received reasonably equivalent value for its assets. Judgment will be entered for the defendants on that claim as well.[1]

## I. FACTUAL BACKGROUND

The facts are drawn from the post-trial record. Having evaluated the credibility of witnesses and weighed the evidence, the court makes the following findings.[2]

### A. The Company

In 2004, Mark Newton co-founded Dura Medic, Inc. ("Dura Medic" or the "Company"). As its name implies, the Company supplied durable medical equipment ("DME"), such as crutches, splints, and braces.

The Company conducted business using a stock-and-bill model. That means the Company entered into contracts with hospitals to stock a supply closet with DME. The hospital did not pay the Company for this service. Instead, when a physician prescribed an item of DME, the hospital would take the item from the supply closet and provide it to the patient. The hospital would notify the Company, and the Company would bill a third-party payor, typically a private insurer or a government health insurance program like Medicare or Medicaid. Before the merger, Medicare

---

[1] This decision addresses a subset of the claims in this consolidated case. The parties also asserted contract claims arising out of the merger agreement. The court will issue a separate decision addressing those claims.

[2] The parties agreed to stipulations of fact in the pre-trial order, cited as "PTO ¶ __." Citations in the form "[Name] Tr. __" refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep. __" refer to witness testimony from a deposition transcript. Citations in the form "JX __ at __" refer to trial exhibits. When more convenient, references to trial exhibits use internal paragraphs or sections.

claims made up about 20% of the Company's gross billings. Sometimes—but rarely—the Company billed the patients. The Company also sometimes negotiated with a hospital to pay cost for any item of DME where the Company otherwise would go unpaid.

The Company did not expect to collect on every claim, but it could operate profitably if it charged sufficiently high prices and collected on enough claims. From 2015 through the first half of 2017, the Company generally billed at 200% of the standard Medicare fee schedule. At that rate, the Company could generate profits even if it collected on a relatively small percentage of claims.

The Company's financial statements distinguished between the gross amount billed, known as "Gross Patient Revenue," and the net amount the Company collected, known as "Net Patient Revenue." The Company recognized Gross Patient Revenue when billed. To derive Net Patient Revenue, the Company started with Gross Patient Revenue and deducted a "Net Revenue Adjustment," representing amounts that the Company likely would not or in fact did not collect.

The Company calculated Net Revenue Adjustment by adding together "Contractual Adjustments," "Bad Debt Expense," and "Adjustments to Patient Revenue." The Contractual Adjustments estimated the amount of Gross Patient Revenue that the Company would not collect based on historical averages. The Company applied the Contractual Adjustment when it billed the payor. As of June 2017, the Company used a Contractual Adjustment of 70%, meaning the Company estimated that it would only collect 30% of Gross Patient Revenue.

4

The Bad Debt Expense reflected amounts the Company no longer expected to collect. The Company based the Bad Debt Expense on the actual accounts receivable in the billing system that management wrote off as uncollectable.

The Adjustments to Patient Revenue represented amounts that the Company billed directly to patients but could not collect. Because billing patients directly involved high collection risk, the Company often negotiated with hospitals to bill them at cost for unpaid patient claims.

The Company referred to the ratio of Net Patient Revenue to Gross Patient Revenue as its "Gross-to-Net Ratio" or GNR. The resulting percentage used Net Patient Revenue as the numerator and Gross Patient Revenue as the denominator.

The Company's collections were unpredictable, both as to timing and amount. The Company collected the bulk of its payments within a year, but some receivables remained outstanding longer, and some could linger for five to seven years. Eventually, management wrote off the amounts it could not collect.

**B.      The Company's Pre-Merger Performance**

From 2006 to 2013, Newton ran the Company. During this period, it "limped along" financially. Newton Tr. 17. That changed in late 2013, when Grant Eckberg and his spouse Deborah Fedorak took over the Company's operations. Both were early investors in the Company.

Eckberg became CEO and managed the Company's day-to-day operations. Fedorak served as CFO. Having Eckberg and Fedorak at the helm freed up Newton

5

to focus on what he did best: establishing and maintaining relationships with hospital clients. He took on the title of chief marketing officer.

With Eckberg and Fedorak in charge, the Company generated healthy revenue. Between 2014 and 2017, the Company increased its yearly revenue from about $3.5 million to $12 million.

During the same period, however, the Company's Gross-to-Net Ratio steadily declined. In other words, the Company was submitting claims with a higher aggregate dollar value, but it was getting paid at an increasingly lower rate. As long as that trend continued, the Company's financial statements risked overstating the Company's value by understating the amount of revenue the Company could eventually collect.

## C.    Early Regulatory Activity

By 2016, the Company's claims began to attract regulatory scrutiny. The Centers for Medicare and Medicaid Services ("CMS") administers Medicare and Medicaid. CMS regulations impose requirements that payees must meet when submitting claims. For example, CMS requires that any claim for DME include the doctor's signatures, the patient's signatures, and item descriptions.

CMS contracts with private firms to administer and enforce its requirements. The pertinent types for this case are Medicare Administrative Contractors ("MACs"),

Zone Program Integrity Contractors ("ZPICs"), and Recovery Audit Contractors ("RACs").[3]

MACs are private healthcare insurers that manage Medicare claims in designated geographical regions. A MAC can deny payment if a claim lacks the required documentation. MACs also conduct prepayment reviews of some or all of a provider's claims. When conducting a prepayment review, a MAC may require the provider to provide additional documentation, such as information demonstrating that the equipment was medically necessary.

MACs also administer the Target Probe and Educate Program ("TPE"). Under that program, a MAC identifies a provider with a high claim error rate, reviews a sample of twenty to forty claims, then provides feedback to the provider about the errors in the sample and how the provider can improve. A TPE audit can involve multiple rounds of review. If a provider fails the first round, then the provider has forty-five days to improve its procedures, and the MAC conducts a second round of review. The process can continue through at least three rounds.

If a provider does not show sufficient improvement after three rounds, then the MAC can refer the provider to CMS for further review plus a range of possible consequences. If warranted, CMS can revoke the provider's authorization to submit

---

[3] Some ZPICs are now called Uniform Program Integrity Contractors ("UPICs"). ZPICs and UPICs are functionally identical, with ZPICs maintaining the zone terminology from an earlier version of the CMS regime. Over time, UPICs have replaced ZPICs. For simplicity, this decision uses the ZPIC nomenclature.

claims to Medicare. CMS may also refer a provider to the Office of Inspector General, which can pursue litigation against the provider or impose civil or criminal penalties.

ZPICs audit claims that providers have submitted to Medicare to ensure compliance with CMS rules. ZPICs focus their audits on potential fraud, waste, abuse, and overpayments. ZPICs can audit claims before providers have been paid and require additional documentation before approving the claim. ZPICs also can audit claims that already have been paid.

RACs investigate whether Medicare or Medicaid paid non-compliant claims. A RAC can pursue a provider for any improper payments.

On June 1, 2017, a ZPIC named Health Integrity, LLC, informed the Company it would be reviewing selected claims. Health Integrity was the ZPIC for Zone 4, so this decision calls it the "Zone 4 ZPIC."

On July 10, 2017, a RAC named Performant Recovery, Inc. (the "RAC Auditor") contacted the Company as part of a nationwide review aimed at identifying improper Medicare payments. In the letter, the RAC Auditor told the Company that it was no longer reviewing a list of Company claims from 2016 and 2017. The RAC Auditor did not say whether or not it was reviewing other claims.

**D.      The Company Explores A Potential Sale.**

In spring 2017, the Company's board of directors (the "Board") decided to explore a sale or other strategic transaction. To reduce the level of concern that

buyers might have about the Company's financial performance, the Company commissioned a quality-of-earnings report from FTI Consulting Inc.

FTI calculated that the Company generated $7.5 million in EBITDA for the trailing twelve months ("TTM") ending June 30, 2017. FTI estimated EBITDA using a Gross-to-Net Ratio of 29.7%. That ratio assumed a Contractual Adjustment of 70%. FTI observed that the Company "calculate[d] contractual adjustments using a [year-end] hindsight review of closed-out patient accounts." JX 16 at 21. FTI concluded that "[m]anagement's contractual process appears reasonable." *Id.*

The Company hired Covington Associates, a boutique investment bank, to contact potential buyers. The Company hired Tim Einwechter as a consultant to help with the sale process. The Company also contracted with Rick Ferreira, then chairman of the Board, to help with the sale process as a paid consultant.

In September 2017, Covington pitched the Company to Jonathan Black, an executive partner with a private equity firm known as Comvest Partners. At Comvest, executive partners are former executives charged with looking for deals in sectors that align with their experience. If a deal looked sufficiently attractive, then Comvest could back the executive partner in an acquisition.

Black had been chief development officer and later chief executive officer at Liberty Medical Supply, a DME provider of diabetes testing supplies. After leaving Liberty, Black started his own business manufacturing and selling blood glucose meters and test strips, two other types of DME.

Black recruited Timothy Tidd to help him evaluate the Company. Tidd had been Liberty's chief information officer and chief operating officer.

Black liked the Company and pitched an acquisition to Roger Marrero, a Comvest senior partner and member of its investment committee. Intrigued, Marrero staffed Comvest vice president Will Callahan and associate Gordon Carroll to a deal team. Comvest partner Maneesh Chawla later joined the team.

### E.    The Negotiations

In September 2017, Comvest began conducting due diligence, assisted by a phalanx of advisors. On October 19, 2017, Comvest sent the Company an initial letter of intent (the "Initial LOI"). It contemplated a purchase price of $60 million, based in part on the FTI quality-of-earnings report. The Initial LOI gave Comvest a forty-five-day exclusivity period.

On October 24, 2017, Comvest and the Company executed the Initial LOI. Meanwhile, CMS contractors continued to audit the Company.

- From August 4 to October 26, 2017, a MAC called Noridian Healthcare Solutions, LLC (the "TPE Reviewer") conducted a first round of TPE review. On November 14, the TPE Reviewer informed the Company that twenty-four of the thirty claims it reviewed contained errors, for an error rate of 80%. The TPE Reviewer advised the Company that it would be "moved to the second round of review."[4]

---

[4] JX 49 at 6; *accord* PTO ¶ 70. Company management didn't pay much attention to the TPE audit. Newton testified that he was not aware of it. Newton Tr. 37. Eckberg testified that he "never paid a lot of attention to the TPE." Eckberg Tr. 142. Both claimed that they did not regard a TPE as an "audit." *Id*. at 142–43; Newton Tr. 81. The Company's compliance counsel made clear that a TPE is an audit, albeit "the least worrisome" kind of audit. Leard Dep. 35.

10

- On December 7, 2017, the Zone 4 ZPIC informed the Company that it was initiating a "comprehensive [prepayment] medical review of [the Company's] billing for Medicare services." JX 67. The Zone 4 ZPIC selected the Company for the review based on an analysis suggesting "aberrancies in your billing." *Id.* The Zone 4 ZPIC later sent the Company several hundred document requests about its Medicare claims. PTO ¶ 71. The Zone 4 ZPIC also told the Company that ZPICs from the areas where patients lived could send additional document requests. JX 67. This decision refers to this audit as the "Second Zone 4 ZPIC Audit," because the Company later learned that it had been the subject of an earlier Zone 4 ZPIC audit.

- In December 2017, AdvanceMed, a Zone 5 ZPIC, sent the Company several hundred document requests about its Medicare claims. Those requests were part of the Second Zone 4 ZPIC Audit.

- In December 2017 and January 2018, SafeGuard Services, a Zone 7 ZPIC, sent the Company eleven document requests about its Medicare claims. Those requests were part of the Second Zone 4 ZPIC Audit.

- On January 5, 2018, the Zone 4 ZPIC told the Company that it had performed a post-payment review of claims for services provided from July 11, 2016, through September 21, 2017. JX 98 at 1. The Zone 4 ZPIC reported that twenty-six claims out of a sample of thirty-seven had errors, for an error rate of 68.8%. *Id.* Although the Company learned of this audit after the Second Zone 4 ZPIC Audit, the audit itself happened first. This decision therefore refers to it as the "First Zone 4 ZPIC Audit."

The Company retained the van Halem Group to respond to the document requests and improve its claim submission process. The Company also consulted with Denise Leard, the Company's longtime CMS compliance counsel.

On January 8, 2018, Leard sent a letter to Newton and Einwechter that summarized the TPE process and provided advice about the Second Zone 4 ZPIC Audit. On January 30, Leard sent a letter to Ferreira that summarized van Halem's findings about the Second Zone 4 ZPIC Audit. Leard reported that the Company's documentation was likely "not sufficient to justify payment in all cases." JX 139 at 4. Damning the Company with faint praise, she added that "the errors do not amount

11

to fraud." *Id.* Leard advised the Company that it needed to lower its error rate to exit from the Second Zone 4 ZPIC Audit. Ferreira forwarded Leard's letter to Black.

Kim Sauber was a key employee for the audits. She was the Company's business analyst and oversaw its billing operations. On February 12, 2018, Sauber told Newton, Einwechter, and Eckberg that CMS contractors had conducted 193 reviews of claims relating to a range of the Company's products and that only fourteen were approved. Einwechter forwarded the email to Ferreira with the following comment:

> So they pick 193 claims and of this ONLY 14 were approved. That is scary with over 90% rejection. Sure the $'s were not large however if if [sic] was sitting on the purchaser side of this transaction the "perception" would clearly be I have revenue model out of control. I will craft email to Comvest tomorrow and try to avoid discussion of number of claims and only report on $'s.

JX 150 at 3. Referring to Comvest, Ferreira responded, "Not sure how we report this and not make these guys nervous." *Id.* at 2–3. Ferreira later added, "F*&k - I don't know how you even defend that!!" *Id.* at 2. He concluded, "Can't get this [deal] closed fast enough!!!" *Id.* at 1–2.

## F.    Comvest Learns About The Second Zone 4 ZPIC Audit.

In early January 2018, Comvest learned about the Second Zone 4 ZPIC Audit. Comvest put the Initial LOI on hold to see how the ZPIC audit played out. Marrero described the deal as "now on life support given some recent diligence findings." JX 119. Later that month, Comvest learned that the Company also had "an ongoing audit in Zone 5." JX 131.

Because of the audits, Comvest sought additional information from the Company. Comvest learned that the Company's monthly cash collections declined from $1,454,000 in October 2017 to $862,000 in February 2018, then rebounded slightly to $947,000 in March 2018. Comvest attributed the decline to the distraction of the Second Zone 4 ZPIC Audit and the sale process. Comvest estimated that without those distractions, the Company would have generated approximately $150,000 more in collections per month.

Ferreira understood that selling the Company was a challenge. On April 1, 2018, he reminded Einwechter in an email that "21 banks looked at this deal and ALL turned it down. A variety of reason [sic] here but three main ones were the ever-increasing contractual allowance, the industry headwinds and the ZPIC audit." JX 231 at 1.

## G.     The Revised Letter of Intent

Having learned about the CMS audits and identified a declining trend in collections, Comvest recalculated the Company's adjusted EBITDA for 2017, reducing it from $7.5 million to $4.3 million.

In April 2018, Comvest sent a revised letter of intent to the Company. It lowered the deal price to $30 million, with $18 million paid in cash at closing plus another $12 million taking the form of an unsecured subordinated promissory note that would be paid over six years.

Eckberg thought the lowered price was reasonable in light of the trend in collections and the audits. In an email to Newton, he noted that the Company was

13

struggling to meet Medicare's requirements for submitting claims, that fixing the Company's problems would require overhauling its procedures, slowing down the submission rate, and spending 30% to 50% more to process claims. Eckberg told Newton, Ferreira, and Einwechter that without a sale to Comvest, it would take "at least a year (or probably more) to address issues that have been recently created and discovered." JX 230 at 2.

With the Company putting more upfront work into the quality of its claims, the rate of claim submission slowed precipitously from 2,507 in January to 217 claims in April 2018.[5] The average submission rate for February and March (1071 claims per month) was about a third of the average submission rate for October 2017 through January 2018 (3181 claims per month). As of May 30, 2018, the Company had a backlog of over 5,000 unsubmitted claims.

## H. More Bad News For The Company

In April and May 2018, the Company received negative feedback from key customers. The Company's largest client by revenue was Stanford Health Care. On April 11, 2018, Stanford gave notice that the Company's contract would terminate in six months. Newton received a copy of the notice.

---

[5] JX 240 at 1; *see* Tidd Tr. 556 (estimating the Company released about 50% of Medicare claims in January–February 2018 but about 10–20% in March–May 2018).

14

Baptist Health System was another of the Company's largest customers. That same month, Baptist reduced the Company's coverage from five of its hospitals to four.

The Company also continued to struggle with the audits. In April 2018, a Zone 3 ZPIC started an inquiry and sent the Company document requests. Van Halem told the Company to expect follow-up requests because of the Company's high error rate. In May, the contractor leading the Zone 5 ZPIC audit told the Company that it had reviewed 220 claims and found errors in 214 of them, for an error rate of 97%.

In emails between themselves, Ferreira and Einwechter candidly acknowledged the Company's problems and plummeting value. In a May 13, 2018 email exchange, Ferreira told Einwechter that "we are selling a house that is springing leaks every day." JX 283 at 1.

## I.     The Merger Agreement And The Seller Note

On May 7, 2018, the Comvest deal team sought formal approval from the Comvest investment committee to buy the Company. The investment committee approved the deal.

On May 22, 2018, the Company entered into a merger agreement with two newly created Comvest entities: an acquisition vehicle named Dura Medic Merger Sub, Inc. ("Merger Sub") and a holding company named Dura Medic Holdings, Inc. ("Holdings"). Holdings was a wholly owned subsidiary of another newly created entity, Dura Medic Parent Holdings, LLC ("Parent"), but Parent was not a party to the agreement.

There were thirty-nine selling stockholders (the "Sellers").[6] The agreement designated DM Seller Representative LLC, a newly created entity managed by Ferreira and Eckberg, as the "Seller Representative." *See* JX 312 (the "Merger Agreement").

Under the Merger Agreement, Merger Sub would merge with and into the Company, with the Company surviving as a wholly owned subsidiary of Holdings (the "Merger"). At closing, the selling stockholders' shares would be converted into the right to receive a total of $18 million in cash from Holdings, subject to potential adjustments. The selling stockholders also would share in a note issued by Holdings with a face value of $12 million (the "Seller Note").

The Merger closed June 6, 2018. That day, Holdings delivered the Seller Note to the Seller Representative.

After the Merger, Parent owned 100% of Holdings, which owned 100% of the Company. A Comvest affiliate owned 63.6% of Parent's units. Other investors, including Black, his friends and family, and Tidd, owned 26.7% of Parent's units.

---

[6] The Sellers are Greg Bailey; Karen Lee Bryant; Gary Lee Campbell; Selle D'Shanna Campbell; Robert Chicoine; Crown Predator Holdings 1, LLC; James T. Doody; Grant Eckberg; Tim Einwechter; Jessica Evans; Deborah Fedorak; Rick Ferreira; Fisher Holdings LLC; G&D Progressive Services, Inc.; Kevin J. Harrington; Sherrie Horton; Becki Jaynes; KLBK Investments, LLC; Lewin Investments, LLC; Marc Mazur; Steven Mintz; Steve E. Nelson; Don Newton; Mark Newton; Stephen J. Nicholas, MD; George Shelton Ochsner; Stephen Ochsner; Jason Pauletto; Richard A. Danzig Profit Sharing Plan & Trust; Martin J. Rucidlo; Kim Sauber; Gavin Scotti; Morton Stayton; Steve E. Nelson Trust; Symcox Family Limited Partnership; Jay Symcox; Ellen Walsh; WIU Foundation; and Edward J. Zecchini.

16

Newton rolled over $1 million of his proceeds from the Merger and received Parent units.

The investments in Parent were structurally subordinated to the Seller Note, which Holdings had issued. The Seller Note in turn was structurally subordinated to any debt at the Company level.

## J. Comvest Gets More Bad News.

After the Merger, Comvest controlled the boards of Parent, Holdings, and the Company. Each entity's governing board had the same five members: Marrero, Chawla, Callahan, and Stacie Brachter, plus Black as the Company's CEO. Tidd became the Company's COO.[7]

Even before the Merger closed, Black and Tidd decided to withhold all Medicare claims until the Company improved its submission process. On May 30, 2018, a week before the Merger closed, Tidd reported on the decision to the Comvest deal team:

> Upon close, I have informed Kim [Sauber] to stop all Medicare claims from billing until we have a QC process in place that ensures that the only claims that go out are clean. This will create more of a backlog in unbilled claims, but I want to ensure that the next audit that surfaces will show that all submitted claims post-close are clean based on what we know, so that our denial rate comes in at under 30%.

---

[7] The Company's headquarters was in Austin, Texas. Black and his family lived in Boston, and he did not relocate after the deal. He tried to manage the Company remotely, visiting Austin as necessary. Newton complains about this arrangement, and while it may have made Black marginally less effective as a leader, it did not contribute materially to the Company's problems.

JX 335 at 1. Black agreed.

After the Merger, the Company began withholding all Medicare claims. The Company continued to submit claims to third-party payors and private insurers.

Black and Tidd decided to withhold claims without knowing about the TPE audit. Black learned about the TPE audit and the first round of results on June 8, 2018, two days after closing.

The Company also faced a new ZPIC audit. One day before closing, on June 5, 2018, the Zone 7 ZPIC selected one of Dura Medic's subsidiaries for "a comprehensive medical review of your billing services." PTO ¶ 86. Two weeks later, the TPE Reviewer reported that the Company had reduced its error rate from 80% to 41.85%, but that was still too high and required a third round of review.

The third round of TPE threatened the Company with the loss of its ability to submit claims to Medicare. A sanction of that magnitude was unlikely but possible.

On June 21, 2018, Black emailed the Seller Representative about the TPE audit. Black was blunt: "The ramifications of a failed round three are not only serious, but also potentially threatening to the continuance of Dura Medic's business, whereby failure could mean everything from an extrapolation and fine to revoking Dura Medic's Medicare provider number." JX 381. He continued: "We are doing everything in our power to ensure clean claims are going out the door to be process [sic] and paid, and in the interim, holding all claims until thoroughly reviewed. This will put a serious burden on our cash flow, but for the long-term good (and compliance) of the business, this is what needs to be done." *Id.*

18

Ferreira and Einwechter thought they had dodged a bullet by selling the Company. Ferreira emailed Einwechter, asking, "Remember the game 'pass the parcel'????" JX 381. Einwechter responded by describing the deal as "[t]he all-time escape job." *Id.*

Meanwhile, the Company learned that it had been the subject of additional RAC audits and that the RACs were demanding reimbursement for noncompliant claims. By October 2019, the Company had received over 100 recoupment demands for the pre-Merger period from 2016 to 2018. The total claims amounted to several hundred thousand dollars of reimbursements.

## K. Comvest Gets A Bit Of Good News.

In September 2018, the Company's efforts to improve its claim submission process started to bear fruit. The Company resumed submitting claims that it believed were fully compliant with CMS requirements. But the rate of claim submission remained low; by October the Company had submitted only 299 claims. The Company's clean-claims rate—the percentage of claims that did not require any additional documentation after being submitted—also remained low. It improved from 5% to 16%. It was not until mid-2019 that the clean-claims rate approached 40%.

The efforts to improve the claim process came at a cost. Submitting complete claims took more time than submitting incomplete claims and rationalizing that the Company could always find and submit more information if it were audited. The new informational demands frustrated the Company's field representatives, who had gotten used to the lackadaisical pre-Merger system. The new informational demands

also frustrated hospital personnel, because the Company's field representatives had to track them down to get all of the information required for a clean claim.

The Company's cash flow also suffered. With the Company withholding incomplete claims, its accounts receivable grew. To address its cash flow needs, the Company secured a $1 million revolving line of credit from CIBC Bank USA ("CIBC") in November 2018.

## L. Comvest Sues for Indemnification.

The Company's claims processes and financial performance were so poor that by fall 2018, Comvest began investigating whether it had claims against the Sellers. By October 2018, Comvest was preparing to assert claims for indemnification. By February 2019, Comvest had retained litigation counsel. On March 28, 2019, Comvest's counsel delivered a claim notice to the Seller Representative that demanded $16,585,605 in indemnification.

On June 21, 2019, Comvest caused the Company and Holdings to sue the Seller Representative and each of the Sellers. The complaint sought indemnification for breaches of representations and warranties in the Merger Agreement. On August 27, 2019, the Seller Representative asserted counterclaims and third-party claims.

## M. The Company Continues To Struggle.

After the Merger, Newton stayed on as chief marketing officer. In March 2019, Black asked Newton to resign. Newton agreed, ending his employment on March 12. Black also terminated senior employees for poor performance, HR reasons, or both.

To improve the Company's processes, Black decided to switch the Company over to Brightree, a different inventory and billing program. The Company had considered and rejected Brightree before the Merger. Getting Brightree installed took time. It was not until February 2019 that the Company started using Brightree for new claims.

Meanwhile, the CMS audits continued:

- On April 15, 2019, the Zone 4 ZPIC selected the Company for prepayment review of a single claim.

- On July 23, 2019, the RAC Auditor demanded that the Company return money for overpayment on four Medicare claims.

- On August 13, 2019, the TPE Reviewer asked the Company for "medical record documentation associated with the reopening of certain Medicare claims previously submitted for payment." JX 620.

- On August 13, 2019, CMS asked for records for seventeen patients who received DME from the Company.

When it purchased the Company, Comvest anticipated J-curve growth. Comvest envisioned that EBITDA initially would fall because of expenditures like switching over to Brightree. After that, growth would pick up and accelerate. Instead, the Company's performance continued to decline.

### N. The Mid-Stream Financings

By spring 2019, the Company needed cash. In April 2019, CIBC increased the Company's line of credit to $2 million. To reduce expenses, Black gave up his salary indefinitely starting in September 2019. Tidd gave up his salary as well.

Between April 2019 and March 2020, the Company obtained capital from Comvest affiliates (the "Mid-Stream Financings"):

21

- In April 2019, the Company borrowed $750,000 in exchange for secured subordinated promissory notes that paid interest at 15% per annum (the "First Debt Issuance").

- In September 2019, the Company borrowed $1.75 million in exchange for secured subordinated promissory notes that paid interest at 15% per annum (the "Second Debt Issuance").

- In December 2019, the Company issued a new class of Series A Preferred Stock in return for $2.5 million (the "First Preferred Equity Issuance"). The Series A Preferred Stock carried a liquidation preference equal to the face value plus all declared but unpaid dividends plus interest accruing at 15% per annum.

- In March 2020, the Company issued additional shares of Series A Preferred Stock in return for $1.25 million (the "Second Preferred Equity Issuance"). The Comvest investment committee refused to approve the purchase unless the Company hired Silverman Consulting, a restructuring firm.

Comvest gave Newton the opportunity to participate in the Mid-Stream Financings, but he declined.

**O.    The Company Looks To Raise Capital Or Sell.**

In January 2020, a mutual acquaintance introduced Black to Luke McGee, CEO of defendant AdaptHealth, LLC. Black and McGee discussed how their companies might work together.

After the Company engaged Silverman in March 2020, management cut costs dramatically, including by laying off over 60% of the Company's employees. The Company also terminated its less profitable customer relationships.

In March 2020, the World Health Organization declared that COVID-19 had caused a global pandemic. The pandemic crushed the Company's business. With fewer people engaging in outdoor sports and similar activities, fewer people suffered injuries that could lead to a purchase from the Company's inventory. Many hospitals

limited access to their facilities, so Company employees could not restock the equipment closets. The Company's sales plummeted.

By spring 2020, it was clear that the Company needed more financing. As an alternative, on May 18, 2020, Black emailed McGee about a potential transaction. The next day, McGee proposed a "structured asset deal" in which AdaptHealth would acquire the Company's assets. JX 819. Black agreed to explore the idea. When McGee did not hear back, he emailed Black to confirm the deal was dead. Black responded that Comvest preferred to raise $4–5 million in new capital.

During summer 2020, Black and Comvest contacted dozens of potential investors. Call logs document the investors they contacted and the investors' responses. A handful of investors asked for an introductory memo about the Company. That memo described the Company as "well-positioned to be a stable platform post-COVID," with "actionable momentum to achieve significant growth in the near term." JX 822 at 12. The memo projected gross profits of $8.2 million in 2022. *Id.* at 13.

### 1. The Beach Possibility

In June and July 2020, Marrero met with John Beach, an investor in skilled nursing facilities and the former CEO of a DME business. They discussed the possibility of Beach leading a consortium of investors to provide capital to the Company. For Beach, any investment would be conditioned on the Company hiring Scott Klosterman, Beach's preferred CEO.

On July 9, 2020, the Comvest deal team briefed the investment committee on a potential transaction with Beach. The deal team assessed the merits and risks of three strategies: Medium/Long Term Exit, Short/Medium Term Exit, and Near Term Liquidation.

The Medium/Long Term Exit option could create the most value, because "[i]f the company can become EBITDA breakeven, there is significant option value between the ongoing business and litigation." JX 842 at 13. But the deal team thought achieving profitability after COVID-19 was unlikely. The Near Term Liquidation option was undesirable and "[l]ikely to lead to least recovery for [Comvest] and co-investors." *Id.* at 16.

At that same meeting, the deal team briefed the investment committee on possibly engaging an investment bank to lead an effort to sell the Company or raise capital. The Company ultimately did not retain a financial advisor.

On July 27, 2020, Marrero spoke to Beach and sent him another set of materials about the Company. Marrero claimed the materials "show[ ] your ability to make real payday once we hit our budgeted number which I think can be conservative case." JX 868 at 1. Those positive words implied that Marrero saw value in the Company. In a follow-on email to Comvest colleagues, Marrero reported that Beach was on the fence and would insist on Klosterman running the Company. Marrero saw no future for Black, reporting that "Jonathan is unbackable." *Id.*

## 2. The Breg Offer

Between June 1 and July 10, 2020, Black, Marrero, Chawla, and Hamilton contacted over three dozen potential investors. No one was interested.

One potential investor proposed an acquisition. On July 14, 2020, DME competitor Breg Group Holdings, Inc., sent Black a non-binding offer to acquire the Company's assets for consideration at closing of $3.5 million to $5 million, paid 80% in Breg common stock and 20% in cash. The offer also contemplated an earnout that could increase the total consideration to $15 million. The Breg offer required sixty days of exclusivity, meaning the Company would have to stop negotiating with Beach.

Black rejected the Breg offer because the Company was "looking to raise $5 million." Black Tr. 385. Put differently, Comvest was pursuing the Medium/Long Term Exit option.

During the two months between July 10 and September 11, 2020, Black and his colleagues contacted Beach six times. During those two months, Black went back to Breg twice. On July 24, Black informed Breg that "we're exploring other investment options for capital and will follow-up." JX 944 at 2. Black went back to Breg again on September 11, 2020. At that point, Breg only was willing to assume the Company's contracts and "provid[e] a soft landing for employees and clients" but without providing any "purchase consideration." JX 939. Black also contacted ten other potential deal partners. Each declined to make an offer.

## P. The AdaptHealth Sale

While Black and Comvest looked for investors or purchasers, the Company's performance deteriorated further. By summer 2020, the Company's net losses exceeded $6 million, with over $2.7 million coming during the first half of the year.

By mid-2020, neither Silverman nor Black thought the Company was a going concern. Silverman "project[ed] that the company will not be able to cover payroll the week ending September 11th [2020]." JX 861 at 1. Silverman repeated these warnings in August and September. In August, Tidd and Black worried that without funding from Comvest, the Company could not make its next payroll.

On August 4, 2020, CMS gave notice that it would revoke the Company's provider number in thirty days because of the Company's failure to respond to its inquiries. That same month, Tidd informed the Company he was resigning.

In a final effort to land the Beach investment, Comvest offered Klosterman a position as president and CFO. A month later, Klosterman turned it down. Beach and his co-investors declined to invest.

At that point, the Company had two options: liquidate or sell for whatever it could get. On September 9, 2020, Comvest invested $100,000 to facilitate an orderly process.

On September 15, 2020, Black reconnected with McGee, the CEO of AdaptHealth. Black sent McGee some "high-level data" that McGee forwarded to a colleague, commenting, "Fire sale[.] Thinking we may want to do something here." JX 2017 at 1.

The next morning, McGee sent Black the following proposal:

- $2 million in cash for substantially all of the Company's assets;

- Up to 25,000 shares of AdaptHealth stock if the Company's "top three accounts" exceed certain billable order targets in 2021;

- Up to 25,000 shares of AdaptHealth stock if the Company's "two new accounts" exceed certain billable order targets in 2021;

- AdaptHealth hires all Company employees for a minimum of ninety days;

- "Black agrees to a 6 month transition agreement for 25k per month and we hopefully discuss longer-term partnership";

- The Company retains its pre-closing receivables; and

- AdaptHealth agrees to collect the Company's pre-closing receivables for a 15% fee.

JX 910 at 1.

Black did not attempt to negotiate the amount of cash consideration at closing. Black did negotiate the earnout and other provisions. The negotiations were difficult, with McGee presenting the offer as "a little bit of a take it or leave it." Black Tr. 280.

On September 17, 2020, Black and McGee reached agreement on key terms. They continued to negotiate a handful of ancillary terms.

There is no persuasive evidence indicating that, other than Black, the directors of the Company, Holdings, or Parent participated in or oversaw the negotiations. The minutes are formulaic and perfunctory.

Between September 18 and October 1, 2020, AdaptHealth conducted due diligence. On September 22, AdaptHealth learned that CMS had revoked the Company's Medicare license. AdaptHealth was surprised and concerned, but did not

lower the price because AdaptHealth always planned to use its own Medicare license to conduct business.

Comvest and Silverman believed a sale to AdaptHealth was preferable to a liquidation. Silverman estimated that a liquidation would yield a total recovery of $829,092, less liquidation costs of $787,083, resulting in net proceeds of $42,009. Internally, Comvest described the sale to AdaptHealth as a way to "maximize senior lender recovery, with potential full 1st lien recovery and some return for 2nd lien lenders." JX 969 at 2.

On October 1, 2020, the Company and AdaptHealth executed a letter agreement governing the sale of assets (the "Sale"). The principal terms had not changed meaningfully from McGee's initial proposal, except that AdaptHealth agreed to issue the Company up to 80,000 additional shares of AdaptHealth Class A common stock if AdaptHealth received orders from the Company's "pre-closing referral sources" and "new referral sources" that hit specified thresholds. JX 1009 § 2(b)(1). The Company committed to provide AdaptHealth with access to Brightree so AdaptHealth could use the database to collect receivables. Another change was to limit the noncompete period under Black's six-month consulting agreement.[8]

---

[8] In earlier negotiations, AdaptHealth proposed that Black would be subject to a three-year noncompete after the six-month consulting agreement. He and McGee eventually agreed to lower the noncompete to one year. JX 2021 at 4.

28

Comvest's investment committee approved the Sale. The boards of the Company, Holdings, and Parent approved the transaction by written consent. No one engaged an investment bank or secured a fairness opinion.

CIBC, the Company's first-position lender, approved the Sale. CIBC received $1.282 million, less than its outstanding loan. The Company later paid CIBC additional amounts as AdaptHealth collected receivables.

The Sale closed on October 2, 2020. It was not a good outcome for the Company's investors. Comvest had invested more than $18 million and lost it all. Black had personally invested $1.5 million. His friends and family had invested over $4 million. They lost it all.

The closing of the Sale accelerated the Seller Note, which immediately became due in full with interest. Holdings was the obligor, but no proceeds flowed up to Holdings to pay the Seller Note. The proceeds went to the Company's creditors.

After the Sale, AdaptHealth's collection efforts stalled before meeting any of the earnout thresholds. Brightree terminated the Company's access to its platform for non-payment. Without access to Brightree, AdaptHealth terminated its agreement to collect the Company's receivables in return for a 15% cut.

**Q.    This Litigation**

On June 21, 2019, Comvest caused the Company and Holdings to sue the Seller Representative and each of the Sellers individually (the "Contract Action"). In that action, the Company and Holdings seek indemnification for breaches of representations and warranties in the Merger Agreement.

On August 27, 2019, the Seller Representative asserted counterclaims and third-party claims in the Contract Action. They contended that Holdings breached the Seller Note through non-payment. They also contended that Holdings and the Company breached the Merger Agreement by intentionally withholding Medicare claims to sabotage the Company's short-term revenues while maximizing the Comvest's indemnification claims and depriving Holdings of distributions that could be used to pay the Seller Note.

On March 18, 2020, Newton asserted derivative claims on behalf of Parent, Holdings, and the Company (the "Derivative Action"). Newton named as defendants Comvest Investment Partners Holdings, LLC, Marrero, Chawla, and Black (collectively, the "Comvest Parties"). Newton also sued Callahan. Newton alleged that the defendants breached their fiduciary duties by engaging in self-interested financing transactions, paying excessive compensation and management fees, and sabotaging the Company's short-term revenues to maximize their indemnification claims and avoid paying the Seller Note.

The Comvest Parties and Callahan moved to dismiss the Derivative Action. On January 11, 2023, the court dismissed the claims as to Callahan. The court also dismissed the claim that Comvest paid itself illicit management fees and overpaid Black.

On February 15, 2021, the Seller Representative filed suit against AdaptHealth, Merger Sub, Holdings, and the Company alleging that the Sale was a fraudulent transfer (the "Fraudulent Transfer Action").

On April 29, 2022, the court granted summary judgment in the Contract Action on the Seller Representative's claim for breach of the Seller Note. As a result of this ruling, Holdings became liable for principal plus interest.

The court consolidated the cases for trial, which lasted five days. The parties introduced 1288 exhibits and deposition transcripts from nineteen individuals. Eleven fact witnesses and three expert witnesses testified live.

## II. LEGAL ANALYSIS

This decision addresses the claims in the Derivative Action. This decision also addresses the claims in the Fraudulent Transfer Action.

## A. Claims Relating To The Post-Merger Management Of The Company

Newton contends in the Derivative Action that the Comvest Parties breached their fiduciary duties by depressing the Company's short-term revenues both to maximize the value of their indemnification claims and avoid paying the Seller Note. The business judgment rule protects those decisions. Judgment will be entered in favor of the defendants on these claims.

"A claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty."[9] The evidentiary record easily establishes the first element. But the evidentiary record fails to support the second element.

---

[9] *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010).

### 1. Fiduciary Status

Directors of a Delaware corporation owe default common law fiduciary duties.[10] Unless a Delaware limited liability agreement provides otherwise, managers owe the same common law fiduciary duties.[11] A majority stockholder or member likewise owes fiduciary duties.[12]

Newton has sued derivatively on behalf of three entities: the Company, Holdings, and Parent. The Company and Holdings are Delaware corporations. Parent is a Delaware limited liability company. The Parent LLC Agreement does not waive fiduciary duties.[13]

Defendants Marrero, Chawla, and Black served as directors or mangers of each entity and owed fiduciary duties in those capacities. Through an affiliate, Comvest was the majority member in Parent, and Parent controlled Holdings and the Company. Comvest therefore owed fiduciary duties to the Company, Holdings, Parent, and Parent's minority members.

---

[10] *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *16 (Del. Ch. Apr. 14, 2017).

[11] *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 661 (Del. Ch. 2012).

[12] *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113–14 (Del. 1994); *Kelly v. Blum*, 2010 WL 629850, at *1 (Del. Ch. Feb. 24, 2010).

[13] JX 346 § 16.5(b).

### 2. A Breach Relating To The Post-Merger Management Of The Company

To determine whether a fiduciary has breached her duties, the court must identify the applicable standard of review.[14] "Delaware has three tiers of review for evaluating [fiduciary] decision-making: the business judgment rule, enhanced scrutiny, and entire fairness."[15]

The business judgment rule is Delaware's default standard of review.[16] The rule presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[17] Unless a plaintiff rebuts one of the elements of the rule, "the court merely looks to see whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives."[18] If the decision was rational, then the inquiry ends.

---

[14] *See Chen v. Howard-Anderson*, 87 A.3d 648, 666 (Del. Ch. 2014); *In re Volcano Corp. S'holder Litig.*, 143 A.3d 727, 737 (Del. Ch. 2016), *aff'd*, 145 A.3d 697 (Del. 2017) (TABLE).

[15] *Chen*, 87 A.3d at 666.

[16] *Firefighters' Pension Sys. of City of Kan. City, Mo. Tr. v. Found. Bldg. Mat'ls, Inc.*, 318 A.3d 1105, 1139 (Del. Ch. 2024).

[17] *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (subsequent history omitted).

[18] *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010).

Enhanced scrutiny is Delaware's intermediate standard of review.[19] Enhanced scrutiny applies to specific, recurring, and readily identifiable situations marked by two features. First, there is a distinct decision-making context where the realities of the situation can subtly undermine the decisions of even independent and disinterested fiduciaries.[20] Second, the decision under review involves the fiduciary intruding into a space where stockholders possess rights of their own. The fiduciary's exercise of corporate power therefore raises questions about the allocation of authority within the entity and, from a theoretical perspective, implicates the principal-agent problem.[21] The resulting situation calls for an intermediate standard of review that examines "the reasonableness of the end that the directors chose to pursue, the path that they took to get there, and the fit between the means and the end."[22]

---

[19] *Firefighters' Pension Sys. of City of Kan. City, Mo. Tr. v. Presidio, Inc.,* 251 A.3d 212, 249 (Del. Ch. 2021).

[20] *In re Trados Inc. S'holder Litig.* (*Trados II*), 73 A.3d 17, 43 (Del. Ch. 2013).

[21] To be clear, directors and officers are not agents of the stockholders, nor are the stockholders their principals. "A board of directors, in fulfilling its fiduciary duty, controls the corporation, not *vice versa.* It would be an analytical anomaly, therefore, to treat corporate directors as *agents* of the corporation when they are acting as *fiduciaries* of the stockholders in managing the business and affairs of the corporation." *Arnold v. Soc'y for Sav. Bancorp., Inc.*, 678 A.2d 533, 540 (Del. 1996) (footnote omitted); *see also Presidio*, 251 A.3d at 286 ("Rather than treating directors as agents of the stockholders, Delaware law has long treated directors as analogous to trustees for the stockholders."). The principal-agent problem uses the language of economic theory, not the language of legal relationships.

[22] *Obeid v. Hogan*, 2016 WL 3356851, at *13 (Del. Ch. June 10, 2016).

Delaware's most onerous standard is the entire fairness test.[23] That standard applies when the fiduciary labors under an actual conflict of interest. Entire fairness is a unitary standard that combines a substantive dimension (fair price) and a procedural dimension (fair dealing).[24] Although the two aspects may be examined separately, they are not distinct elements of a two-part test. Instead, "[a]ll aspects of the issue must be examined as a whole since the question is one of entire fairness."[25] Although the transaction must be entirely fair, "perfection is not possible, or expected."[26]

Newton contends that the Comvest Parties breached their fiduciary duties by depressing the Company's short-term revenues to maximize the Comvest Parties' indemnification rights and avoid paying the Seller Note. Newton asserts that to achieve that goal, the Comvest Parties withheld Medicare claims, fired Newton and other key employees, and diverted the Company's resources to litigation.[27]

---

[23] *Presidio*, 251 A.3d at 249.

[24] *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1973).

[25] *Id.*

[26] *Id.* at 709 n.7.

[27] Newton also criticized Black as a generally incompetent CEO. For example, Newton noted that Ochsner speculated about COVID-19 being a missed business opportunity to sell personal protective equipment that Black allegedly lacked the vision to pursue. That is not a breach of duty.

35

Newton argues that the court should review these decisions under the entire fairness standard. At the pleading stage, the court viewed Newton's theory as reasonably conceivable. At trial, Newton bore the burden of proving in the first instance that a conflict of interest existed sufficient to implicate the entire fairness test. Newton failed to carry that initial burden.

### a. Withholding Medicare Claims

Newton alleges that Black withheld pre-closing Medicare claims to depress the Company's performance and support an indemnification claim. Newton also alleges that Black withheld Medicare claims so that the Comvest Parties could avoid paying the Seller Note. Under the terms of the Seller Note, Holdings' obligation to make payments depended on the Company hitting an EBITDA threshold. JX 414 § 3(a). Newton alleges that the Comvest Parties depressed the Company's short-term revenues to avoid hitting the threshold.

Absent a conflict of interest, the business judgment rule applies to the types of managerial decisions that Newton challenges. Newton failed to prove that the decision to withhold Medicare claims post-closing could create a conflict for the Comvest Parties in the form of a desire to maximize their indemnification claims. Under the Merger Agreement, Comvest could only obtain indemnification for pre-closing issues.[28] Under Newton's theory, Black and Tidd should have withheld pre-

---

[28] JX 312 § 4.5(a) (financial statements up to April 30, 2018); *id.* § 4.5 (e) (Gross-to-Net Ratio up to April 30, 2018); *id.* § 4.7(a) (general legal compliance from January

Merger claims but not post-Merger claims. Instead, they withheld all Medicare claims. They also continued withholding claims long after doing so could result in an indemnification claim.[29] Black, Marrero, and Chawla credibly denied having any intention to sabotage the Company, short-term or otherwise.[30]

Newton also failed to prove that the decision to withhold Medicare claims resulted from a desire to avoid paying interest on the Seller Note. Under the Seller Note, Holdings had to pay interest if the Company's "[c]onsolidated EBITDA for the 12-month period ending on the month immediately prior to such interest [is] at least $5,000,000." JX 414 § 3(a). The Company could not include revenue for pre-closing Medicare claims in its post-closing EBITDA calculations. The Company booked revenue at the time of billing, not the time of collection. At best, the Comvest Parties could have avoided paying the seven percent annual interest on the Seller Note, but the interest was capitalized and due at the maturity date. *Id*. Delaying payments would not have made the obligation disappear.

Without an overarching conflict, Newton had to rebut the business judgment rule by providing that Black acted disloyally, in bad faith, or in a grossly negligent

---

1, 2015, until Merger); *id.* § 4.8(a) (healthcare legal compliance for three years before Merger).

[29] *See* JX 606 at 2, 13 (July 22, 2019); JX 507 at 3 (February 25, 2019); JX 750 at 4 (February 24, 2020).

[30] Black Tr. 341–42; Marrero Tr. 894, 961; Chawla Tr. 1124–25.

manner. Instead, the evidence showed that Black and Tidd's decision to withhold Medicare claims resulted from a good-faith effort to comply with the law.

Black and Tidd testified credibly that they did not withhold Medicare claims for any improper purpose. Both also testified credibly that they sought to comply with the law.

Newton argues that Black breached his fiduciary duties by not maintaining the Company's pre-Merger billing practices. But Black concluded in good faith that the Company's pre-Merger billing practices generated such high rates of non-compliant claims as to put the Company at legal risk. The numerous audits of the Company provided ample basis for that conclusion. Other individuals involved with the Company reached the same conclusion in real time. *See* JX 222; JX 267.

Newton contends that Black and Tidd overreacted to the TPE audit, implying pretense. To the contrary, Black and Tidd explained credibly why they took a conservative position. At the time, Company's internal clean-claims rate was only 5%. In other word, 95% of the Company's claims did not comply with CMS requirements. Given that rate of non-compliance, the decision to withhold claims was reasonable. Black and Tidd also justifiably feared serious consequences if the Company's clean-claims rate did not improve, such as the revocation of the Company's Medicare license, a referral to the Office of Inspector General, or other enforcement actions. If anything, Newton's cavalier attitude to the Company's compliance problem suggests that he either was reckless in his own approach to compliance or was willing to break the law in pursuit of profits.

The evidence at trial showed that the high rate of bad claims resulted from pre-Merger business practices. Newton disagreed and argued that the high rate of bad claims resulted from CMS conducting more audits industry-wide in response to an increase in providers using misleading television advertisements to solicit patients. *See* Newton Tr. 33–34. To the contrary, the Company faced the First Zone 4 ZPIC Audit for claims dating back to July 2016, before the industry-wide crackdown in late 2017 or early 2018. JX 98 at 1; Leard Dep. 48–49. That ZPIC audit revealed a 68.8% error rate and "a pattern of claim denials." JX 98 at 1. The abysmal claims rate resulted from how Newton and his colleagues ran the business, not from anything Black or Tidd did.

Newton also suggested that the Company's claims problems resulted from its high growth rate, which suggested to CMS that its claims submissions could be flawed. The evidence instead showed that the Company's irresponsible approach to pre-Merger claims submissions enabled the Company to appear to have achieved a high growth rate. The Company engaged in a form of channel stuffing by which it submitted a high rate of non-compliant claims to boost its revenue numbers. That was not real growth. It was a business plan that prioritized profits over legal compliance.

The business judgment rule protects the decision Black made about submitting claims. The evidence at trial showed that Black was motivated by a desire to comply with CMS regulations and end the CMS audits. That was the correct choice under Delaware law. A fiduciary does not breach his duties by being too law-abiding.

### b. Terminating Key Employees

Newton also contends that the Comvest Parties breached their fiduciary duties by terminating Newton and other key employees in an effort to reduce the Company's short-term performance, support an indemnification claim, and avoid payments on the Seller Note. The record did not support that claim. The business judgment rule applies.

Newton again fails to identify an overarching conflict of interest that could elevate the standard for review. The Comvest Parties lacked any motivation to terminate employees to depress the Company's short-term revenue. Comvest's indemnification claims turned on pre-Merger performance, and interest on the Seller Note would accrue regardless.

Black was not self-interested in any personnel decisions. He had nothing to gain personally from firing employees, and he did not fire anyone to meet cost-cutting criteria that might help him achieve a bonus or promotion. Having personally invested $1.5 million in the Company and convinced members of his friends and family to invest over $4 million, Black had every incentive to maximize profits from day one. Evidencing that he made good-faith efforts to cut costs, Black decided to forgo his own salary indefinitely just six months after firing Newton.

Given the Company's struggles, reducing headcount was a necessary step in cutting costs. In early 2020, Silverman recommended laying off 61% of the Company's employees. JX 938 at 2; Nerger Tr. 1035–36.

Black had good reasons for terminating employees. He testified credibly that he terminated Newton for poor performance and "HR reasons." Black Tr. 353. He explained that Newton was "checked out" and not generating new clients. Black Tr. 264–65. Others at the Company documented similar impressions before the Merger closed. *See* JX 219 at 1; JX 222 at 1; JX 224 at 1. And the Company's HR director informed Black that Newton was sometimes intoxicated on the job and had inappropriate exchanges with a female employee. JX 445 at 1; Guevara Tr. 991–92. Newton tried to defend his performance by testifying that he and another terminated employee were responsible for landing over 100 new accounts after the Merger. But that employee testified at deposition that he "was typically lead on–on all sales," and that "[he] brought in somewhere between a hundred and two hundred accounts," and he did not mention Newton when asked who participated in bi-weekly sales meetings. Ochsner Dep. 61. Black also had convincing reasons for firing other employees. *See* Black Tr. 266–68, 353, 358–60; JX 665 at 1–2. Black was a credible witness.

The business judgment rule protects the decisions Black made about firing employees.

### c.   Allocating Funds To Potential Litigation

In a third theory, Newton argues that the Comvest Parties breached their fiduciary duties by diverting Company resources to litigate their indemnification claims. At the pleading stage, that theory was reasonably conceivable. At trial, there was no evidence to support it. The Company had legitimate indemnification claims. It was entitled to develop and pursue them.

41

### 3. The Conclusion Regarding The Claims Relating To Managing The Company

Newton failed to prove that the Comvest Parties faced any conflict when deciding how to manage the Company. The business judgment rule therefore applied, and Newton failed to rebut any of its presumptions. Judgment will be entered in favor of the Comvest Parties on those claims.

## B. Claims Relating To The Mid-Stream Financings

Newton asserts two challenges to the Mid-Stream Financings. One challenge is legal; the other is equitable. The legal challenge to one financing succeeds. The equitable challenge to three financings succeeds.

### 1. The Legal Challenge

Newton alleges that the Comvest Parties and Parent breached Parent's LLC Agreement when engaging in the Second Debt Issuance, the First Preferred Equity Issuance, and the Second Preferred Equity Issuance (collectively, the "Challenged Financings"). Newton alleges that the defendants failed to obtain approval from Parent's unaffiliated managers as required by Section 6.6. of the LLC Agreement.

Section 6.6. of the LLC Agreement states:

> Neither the Company nor any of its Subsidiaries shall enter into, directly or indirectly, any contract, agreement, arrangement or transaction or series of transactions, whether or not in the ordinary course of business, with any Comvest Related Party (each, an "Affiliate Transaction"), unless such Affiliate Transaction is, determined by the Board of Managers in good faith using its reasonable business judgment on terms that are arms' length and no less favorable to the Company or any of its Subsidiaries as those that could reasonably be expected to be obtained by the Company or any of its Subsidiaries at that time in a comparable arm's length transaction with a Person that is not a Comvest Related Party . . . .

JX 355 § 6.6. Under the LLC Agreement, the term "Comvest Related Parties" included the Comvest entities and "each of their respective general partners, managers, directors, and employees, as well as any investment fund managed by the foregoing." *Id*. § 1. This provision thus prohibits transactions with a "Comvest Related Party" unless the Parent board determines that the "Affiliate Transaction" is on market terms.

As a baseline matter, Section 6.6 would cover the Challenged Financings because each involved the issuance of securities to a Comvest affiliate. But there is a carveout that states:

> [E]ach of the following shall not be subject to this Section 6.6 (and shall not be considered an "Affiliate Transaction"):
>
> (a) payments and reimbursements to the Investor Member or any of its Affiliates in accordance with the terms and conditions of the applicable Management Agreement,
>
> (b) the entry into transactions with and/or any payments to any portfolio companies of the Investor Member or its Affiliates which are, determined by the Board of Managers in good faith using its reasonable business judgment, on terms that are arms' length and no less favorable to the Company or any of its Subsidiaries as those that could reasonably be expected to be obtained by the Company or any of its Subsidiaries at that time in a comparable arm's length transaction with a Person that is not a Comvest Related Party,
>
> (c) the issuance of Units or other securities (other than Profits Interest Units) of the Company to the Investor Member or its Affiliates (other than the Company and its Subsidiaries) so long as such issuance is in compliance with the terms and conditions of Section 12.2, and/or
>
> (d) any transaction (including any transaction contemplated by this Agreement, the Plan, the Executive Plan, any Award Agreement, the Management Agreements, and for employee benefits and employment agreements entered into in the ordinary course of business) entered into by the Company or any of its Subsidiaries in the ordinary course of business if such arrangements are on terms, determined by the Board

43

of Managers in good faith using its reasonable business judgment to be arms' length and no less favorable to the Company or any of its Subsidiaries as those that could reasonably be expected to be obtained by the Company or any of its Subsidiaries at that time in a comparable arm's-length transaction with a Person that is not a Comvest Related Party.

JX 355 § 6.6(a)–(d) (formatting added).

Section 6.6(c) covers the Challenged Financings. Section 6.6(c) exempts "the issuance of . . . securities" to the "Investor Member or its Affiliates (other than the Company and its Subsidiaries)." The LLC Agreement does not define "securities," but Black's Law Dictionary defines "security" as "[a]n instrument that evidences the holder's ownership rights in a firm (e.g., a stock), the holder's creditor relationship with a firm or government (e.g., a bond), or the holder's other rights (e.g., an option)."[31] The Challenged Financings involved debt and equity issuances. Each was an "issuance of . . . securities."

The carveout in Section 6.6(c) applies if "such issuance is in compliance with the terms and conditions of Section 12.2." Section 12.2(a) states:

[Parent] agrees that neither it nor any Subsidiary will sell or issue or agree to sell or issue (i) any Units or other equity securities of the Company or any Subsidiary, (ii) securities convertible into or exercisable or exchangeable for Units or other equity securities of the Company or any Subsidiary, or (iii) options, warrants, convertible debt, or rights carrying any rights to purchase Units or other equity securities of the Company or any Subsidiary (collectively, the "Company Securities"), unless the Company

(A) submits a written notice to all Preferred Unit Holders and all Common Unit Holders (in each case, a "Participating Member" and

---

[31] Security, *Black's Law Dictionary* (11th ed. 2019).

44

collectively, the "Participating Members") identifying the terms of the proposed sale (including price, number or aggregate principal amount of securities and all other material terms), and

(B) offers to each Participating Member the opportunity to purchase its Participating Share (or any portion thereof) of the Company Securities (subject to increase for over-allotment if any Participating Member does not fully exercise his, her or its respective right) on terms and conditions, including price, not less favorable than those on which the Company proposes to sell such Company Securities to the Investor Member or any third party (a "Pre-Emptive Right Notice").

JX 355 § 12.2(a) (formatting added). Newton received notices inviting him to participate in each of the Challenged Financings. Newton Tr. 90–93; JX 639; JX 640; JX 643; JX 659; JX 690; JX 743.

To save his claim, Newton argues that the Section 12.2(a) notices were deficient. At trial, Newton identified only one deficiency: The written notice for the Second Debt Issuance did not identify the interest rate. Newton Tr. 92–93; JX 639; JX 640; JX 643. He had no other challenges to the First Preferred Equity Issuance or the Second Preferred Equity Issuance.

The interest rate is a "material term."[32] Parent therefore technically breached Section 6.6. as to the Second Debt Issuance by issuing a deficient notice. Otherwise, Newton failed to prove that the notices for any of the other issuances were deficient.

---

[32] *See, e.g.*, *APS Cap. Corp. v. Mesa Air Gp., Inc.*, 580 F.3d 265, 273 (5th Cir. 2009) ("[I]n a contract to loan money, the material terms will generally be: the amount to be loaned, maturity date of the loan, the interest rate, and the repayment terms.").

Judgment will be entered establishing that the Second Debt Issuance violated the LLC Agreement. Otherwise, judgment will be entered in favor of the defendants on this claim.

## 2. The Equitable Challenge

Newton also contends that the defendants breached their fiduciary duties by effectuating the Second Debt Issuance, the First Preferred Equity Issuance, and the Second Preferred Equity Issuance. Newton alleges that the Challenged Financings were interested transactions and not entirely fair.

The entire fairness standard applies to a transaction between an entity and its controller.[33] The entire fairness standard also applies when the board making the decision lacks a majority of disinterested and independent decision makers.[34] The Challenged Financings were interested transactions with a controller, and the Company's board lacked an independent and disinterested majority. The entire fairness standard applies.

The substantive dimension of the fairness inquiry examines the transactional result. The cases that developed the entire fairness test historically involved freeze-outs or squeeze-outs. The earliest freeze-outs involved corporations selling all of their assets for a package of consideration, typically cash, then dissolving and distributing

---

[33] *In re Match Gp., Inc. Deriv. Litig.*, 315 A.3d 446, 451 (Del. 2024).

[34] *Aronson*, 473 A.2d at 812.

the net cash to stockholders.[35] After mergers became the preferred transactional vehicle, the leading cases involved squeeze-outs in which the minority shares were converted into the right to receive a specific amount of cash.[36] The substantive fairness of the transaction therefore largely turned on the price that the minority stockholders received, and "fair price" became the dominant nomenclature for the substantive dimension. In that setting, the fair price inquiry generally involved comparing what the stockholders received with their proportionate share of the corporation's value as a going concern. Thus, in the canonical framing, fair price "relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock."[37] But the substantive dimension of the entire fairness inquiry has never been narrowly focused on price. The true "test of fairness" is whether the minority stockholder receives at least "the substantial equivalent in value of what he had before."[38]

---

[35] *See Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016, 1033–34 (Del. Ch. 2020) (describing history of asset sales and mergers).

[36] *Id.*

[37] *Weinberger*, 457 A.2d at 711.

[38] *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 114 (Del. 1952); *accord Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 940 (Del. 1985) ("[T]he correct test of fairness is 'that upon a merger the minority stockholder shall receive the substantial equivalent in value of what he had before.'" (quoting *Sterling*, 93 A.2d at 114)); *see* Lawrence A. Hamermesh & Michael L. Wachter, *The Fair Value of Cornfields in Delaware Appraisal Law*, 31 J. Corp. L. 119, 139 (2005) (arguing for a remedial

The procedural dimension of the entire fairness inquiry examines the process that generated the result. Known as "fair dealing," it "focuses upon the conduct of the corporate fiduciaries in effectuating the transaction."[39] The procedural dimension addresses how the transaction came about and "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."[40]

The procedural dimension matters because the substantive dimension is often contestable. "The concept of fairness is of course not a technical concept. No litmus paper can be found or [G]eiger-counter invented that will make determinations of fairness objective."[41] Instead, a judgment concerning fairness "will inevitably constitute a judicial judgment that in some respects is reflective of subjective reactions to the facts of a case."[42] Thus, if fiduciaries successfully replicate arm's-

standard that "provides the minority shareholders with the value of what was taken from them").

[39] *Kahn v. Tremont Corp.* (*Tremont II*), 694 A.2d 422, 430 (Del. 1997).

[40] *Weinberger*, 457 A.2d at 711.

[41] *Kahn v. Tremont Corp.* (*Tremont I*), 1996 WL 145452, at *8 (Del. Ch. Mar. 21, 1996) (Allen, C.) ("A fair price is a price that is within a range that reasonable men and women with access to relevant information might accept."), *rev'd on other grounds*, *Tremont II*, 694 A.2d 422.

[42] *Cinerama, Inc. v. Technicolor, Inc.* (*Technicolor Plenary III*), 663 A.2d 1134, 1140 (Del. Ch. 1994) (Allen, C.), *aff'd*, *Cinerama, Inc. v. Technicolor, Inc.* (*Technicolor Plenary IV*), 663 A.2d 1156 (Del. 1995).

length bargaining, then that evidence of fair dealing can validate a debatable outcome. But the opposite is also true: a dubious process can call into question a low but nominally fair price.[43] "Factors such as coercion, the misuse of confidential information, secret conflicts, or fraud could lead a court to hold that a transaction that fell within the range of fairness was nevertheless unfair compared to what faithful fiduciaries could have achieved."[44] Where those factors are present, a court may conclude that the transaction is not entirely fair. As a remedy, the court could award a "fairer price"[45] or rescissory damages.

---

[43] *See Tremont II*, 694 A.2d at 432 ("[H]ere, the process is so intertwined with price that under *Weinberger*'s unitary standard a finding that the price negotiated by the Special Committee might have been fair does not save the result."); *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *37 (Del. Ch. July 6, 2018) ("Just as a fair process can support the price, an unfair process can taint the price."), *aff'd sub nom. Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019); *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1183 (Del. Ch. 1999) ("[T]he unfairness of the process also infects the fairness of the price."), *aff'd*, 766 A.2d 437 (Del. 2000) (per curiam).

[44] *ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 3421142, at *19 (Del. Ch. July 21, 2017), *aff'd*, 184 A.3d 1291 (Del. 2018) (TABLE).

[45] *Id.*; *accord Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 467 (Del. Ch. 2011) ("Depending on the facts and the nature of the loyalty breach, the answer can be a 'fairer' price."); *see, e.g., In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *2 (Del. Ch. Aug. 27, 2015) (finding that controller and his associate had engaged in fraud; holding that "[u]nder these circumstances, assuming for the sake of argument that the $13.50 price still fell within a range of fairness, the stockholders are not limited to a fair price. They are entitled to a fairer price designed to eliminate the ability of the defendants to profit from their breaches of the duty of loyalty."); *HMG/Courtland Props., Inc. v. Gray*, 749 A.2d 94, 116–17 (Del. Ch. 1999) (finding that although price fell within lower range of fairness, "[t]he defendants have failed to persuade me that HMG would not have gotten a materially higher value for Wallingford and the Grossman's Portfolio had Gray and Fieber come clean about Gray's interest. That is, they have not convinced me that their misconduct did not

### a. Procedural Fairness

Indicia of a fair process include negotiations by a majority of disinterested and independent directors or appointment of a special committee, actual negotiation over price, obtaining stockholder approval, receiving guidance from qualified advisors, and testing the market.[46] None of these traditional indicia of fairness were present for the Challenged Financings.

At trial, Marrero stated that there were no negotiations "because we were the people stepping up." Marrero Tr. 903. If the boards had canvassed the market and found none, then a fair process might involve a counterparty dictating price. But that is not what happened. The last financing took place in March 2020. The Company did not begin searching for investors until June 2020.

Comvest also argues that the process was fair because all Parent unitholders and all Company shareholders were given an opportunity to participate. In some circumstances, an opportunity to participate can be evidence of fair dealing.[47] But

---

taint the price to HMG's disadvantage."); *Bomarko*, 794 A.2d at 1184–85 (holding that although the "uncertainty [about] whether or not ITI could secure financing and restructure" lowered the value of the plaintiffs' shares, the plaintiffs were entitled to a damages award that reflected the possibility that the company might have succeeded absent the fiduciary's disloyal acts).

[46] *See In re Columbia Pipeline Gp., Inc. Merger Litig.*, 2021 WL 772562, at *45 (Del. Ch. Mar. 1, 2021); *In re Cox Commc'ns, Inc. S'holder Litig.*, 879 A.2d 604, 606 (Del. Ch. 2005); *Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc.*, 532 A.2d 1324, 1336–37 (Del. Ch. 1987).

[47] *See Cancan Dev., LLC v. Manno*, 2015 WL 3400789, at *24 (Del. Ch. May 27, 2015) (finding capital calls were entirely fair where investor "was the only possible

50

when a controller leads the financing, minority investors face the risk that by participating, they will open themselves to greater exploitation. A minority investor can decline to make itself more vulnerable without giving up its ability to challenge a transaction. That was particularly true here because the relationship between the parties had become strained. Black had fired Newton, and Newton thought Black was destroying the Company. Newton was never going to participate in a financing in which he gave Black and Comvest more money to misuse (his view). Newton Tr. 93. In the absence of other procedural safeguards, the Comvest Parties' decision to offer the Challenged Financings to other holders cannot save the process. The fair process aspect of the entire fairness test weighs heavily against a finding of fairness.

### b.    Substantive Fairness

Substantive fairness considers indications like contemporaneous market evidence, expert analysis, and contemporaneous financial analyses.[48] None of the traditional indicia of fairness were present in the pricing of the Challenged Financings.

---

source of funds" and that investor gave other unitholders "the opportunity to participate on equal terms").

[48] *See In re Appraisal of Dole Food Co., Inc.*, 114 A.3d 541, 557 (Del. Ch. 2014) ("One informative source of probative evidence is the contemporaneous views of financial professionals who make investment decisions with real money[.]"); *Dole Food*, 2015 WL 5052214, at *34 ("The principal evidence on the issue of fair price consists of the expert opinions at trial, the Committee's negotiations, Lazard's fairness opinion, and market indications.").

To demonstrate fair price, the Comvest Parties testified that the boards and Comvest investment committee deliberated about the interest rate for the debt issuances and the dividend rate for the preferred stock issuances. Black Tr. 254; Marrero Tr. 785–88. Consideration by interested fiduciaries is not persuasive.

Black and Marrero also testified that the boards determined that the interest and dividend rates were consistent with market rates. They did not provide any evidence other than their say-so.

Marrero also testified at trial that the boards measured the interest rates and dividend rates against the CIBC loan. That comparison hurts rather than helps the Comvest Parties. The interest rate on the CIBC loan was LIBOR plus 300bps. JX 442 at 14. The Second Debt Issuance occurred in September 2019, when LIBOR was approximately 2%.[49] The First Preferred Equity Issuance occurred in December 2019, when LIBOR was even lower.[50] And the Second Preferred Equity Issuance occurred in March 2020, when LIBOR was around 1%.[51] To be comparable to the CIBC loan, the Second Debt Issuance would have had an interest rate of 5% rather than an interest rate of 15%, and the preferred share issuances should have had dividend rates of 4% to 4.5% rather than 15%. Of course, the CIBC loan was secured, and the

---

[49] *LIBOR Rates—30 Year Historical Chart*, MACROTRENDS, https://www. macrotrends.net/1433/historical-libor-rates-chart (last visited Jan. 28, 2025).

[50] *Id.*

[51] *Id.*

Challenged Financings were either junior debt or equity. The Challenged Financings therefore commanded a greater rate of return. But the Comvest Parties did not explain credibly why they imposed a rate of 15%.

Finally, the Comvest Parties argue that Newton provided no testimony that the interest and dividend rates were excessive. Under the entire fairness test, the Comvest Parties had the burden to prove fairness, not the other way around.

The Comvest Parties failed to prove that the Second Debt Issuance, the First Preferred Equity Issuance, and the Second Preferred Equity Issuance were entirely fair. Judgment will be entered in Newton's favor on that point.

### c. The Remedy

Equitable subordination is a remedy that a court can deploy to address a breach of duty. "Equitable subordination is a doctrine that, based on a creditor's inequitable conduct and its effect on other creditors, allows that creditor's debt to be subordinated to other claims in bankruptcy or allows the creditor's liens to be transferred to the bankruptcy estate."[52] That is an appropriate remedy here.

The Comvest Parties engaged in the Challenged Financings at the Company level. That gave those financings structural priority over the Seller Note, which Holdings issued. As a remedy for the Comvest Parties' legal and equitable violations, the Challenged Financings are equitably subordinated to be junior to the Seller Note.

---

[52] *Grassi Fund Admin. Servs., Inc. v. Crederian, LLC*, 2022 WL 1043626, at *4 n.43 (Del. Ch. Apr. 7, 2022) (quoting *Nelson v. Emerson*, 2008 WL 1961150, at *4 n.13 (Del. Ch. May 6, 2008)).

To implement this relief, the court will treat the Seller Note as if the Company issued it. To the extent the Company has funds it can use to pay down debt, the Seller Note and the Challenged Financings will have a priority junior to other Company creditors but senior to the holders of common equity, and the Seller Note will have priority senior to the Challenged Financings.

## C.    Claims For Breach Of Fiduciary Duty Relating To The Sale

Newton finally asserts challenges to the Sale. He contends that the defendants breached their fiduciary duties when searching for financing and when negotiating and approving the Sale. Enhanced scrutiny applies, and the defendants proved that the Sale fell within a range of reasonableness. The defendants therefore did not breach their fiduciary duties.

The parties debate the proper standard of review. The Comvest Parties want the business judgment rule to apply. Newton wants entire fairness to apply. This decision applies enhanced scrutiny.

As discussed previously, enhanced scrutiny is Delaware's intermediate standard of review. One scenario where it applies is where corporate fiduciaries are considering whether to sell a corporation or engage in a similar type of end-stage transaction for stockholders. In this manifestation, enhanced scrutiny carries forward the standard of review that the Delaware Supreme Court expressly applied

54

in *Revlon*.[53] Although that opinion relied more on stirring rhetoric (auctioneers!) than a clearly articulated justification, then-Vice Chancellor Strine subsequently explained that enhanced scrutiny in this setting is

> rooted in a concern that the board might harbor personal motivations in the sale context that differ from what is best for the corporation and its stockholders. Most traditionally, there is the danger that top corporate managers will resist a sale that might cost them their managerial posts, or prefer a sale to one industry rival rather than another for reasons having more to do with personal ego than with what is best for stockholders.[54]

He later explained that because "the potential sale of a corporation has enormous implications for corporate managers and advisors, and a range of human motivations, including but by no means limited to greed, can inspire fiduciaries and their advisors to be less than faithful . . . ."[55] The scenario also involves possible encroachments on the stockholders' right to vote on (and potentially reject) the board's preferred transaction.

To satisfy enhanced scrutiny in an M&A setting, the defendant fiduciaries must prove both (i) the reasonableness of "the decisionmaking process employed by the directors, including the information on which the directors based their decision" and (ii) "the reasonableness of the directors' action in light of the circumstances then

---

[53] *See Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 179–82 (Del. 1982).

[54] *Dollar Thrifty*, 14 A.3d at 597 (footnotes omitted).

[55] *In re El Paso Corp. S'holder Litig.*, 41 A.3d 432, 439 (Del. Ch. 2012).

existing."[56] "Through this examination, the court seeks to assure itself that the board acted reasonably, in the sense of taking a logical and reasoned approach for the purpose of advancing a proper objective, and to thereby smoke out mere pretextual justifications for improperly motivated decisions."[57]

"The reasonableness standard permits a reviewing court to address inequitable action even when directors may have subjectively believed that they were acting properly."[58] The reasonableness standard, however, does not permit a reviewing court to freely substitute its own judgment for the directors' judgment.

> There are many business and financial considerations implicated in investigating and selecting the best value reasonably available. The board of directors is the corporate decisionmaking body best equipped to make these judgments. Accordingly, a court applying enhanced judicial scrutiny should be deciding whether the directors made a reasonable decision, not a perfect decision. If a board selected one of several reasonable alternatives, a court should not second-guess that choice even though it might have decided otherwise or subsequent events may have cast doubt on the board's determination. Thus, courts will not substitute their business judgment for that of the directors, but will determine if the directors' decision was, on balance, within a range of reasonableness.[59]

---

[56] *Paramount Commc'ns, Inc. v. QVC Network, Inc.*, 637 A.2d 34, 45 (Del. 1994).

[57] *Dollar Thrifty*, 14 A.3d at 598.

[58] *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 830–31 (Del. Ch. 2011).

[59] *QVC*, 637 A.2d at 45.

Enhanced scrutiny "is not a license for law-trained courts to second-guess reasonable, but debatable, tactical choices that directors have made in good faith."[60] "[A]t bottom *Revlon* is a test of reasonableness; directors are generally free to select the path to value maximization, so long as they choose a reasonable route to get there."[61]

The Comvest Parties argue that the court should apply the business judgment rule, but the transactional context elevates the standard of review from the business judgment rule to enhanced scrutiny. The Sale was a final-stage transaction that effectively ended the stockholders' ongoing investment in the Company. The Sale thus implicated the last-period problem and the attendant possibility that the

---

[60] *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1000 (Del. Ch. 2005).

[61] *Dollar Thrifty*, 14 A.3d at 595–96.

interests of the corporate fiduciaries and their beneficiaries could diverge.[62]

Enhanced scrutiny therefore provides the operative standard of review.[63]

---

[62] *See In re Columbia Pipeline Gp., Inc. Merger Litig.*, 299 A.3d 393, 460 (Del. Ch. 2023) ("The period leading up to the Merger was a time when the hydraulic pressures of the last period of play could and did cause the interests of the corporate fiduciaries and their beneficiaries to diverge."); *Dollar Thrifty*, 14 A.3d at 597 ("The heightened scrutiny that applies in the *Revlon* (and *Unocal*) contexts [is], in large measure, rooted in a concern that the board might harbor personal motivations in the sale context that differ from what is best for the corporation and its stockholders."). For scholarly discussions of this common scenario, see, for example, Ronald J. Gilson & Bernard S. Black, *The Law and Finance of Corporate Acquisitions* 719–21 (2d ed. 1995); Stephen M. Bainbridge, Unocal *at 20: Director Primacy in Corporate Takeovers*, 31 Del. J. Corp. L. 769, 788–89 (2006); Sean J. Griffith, *The Costs and Benefits of Precommitment: An Appraisal of* Omnicare v. NCS Healthcare, 29 J. Corp. L. 569, 615–16 (2004); Sean J. Griffith, *Deal Protection Provisions in the Last Period of Play*, 71 Fordham L. Rev. 1899, 1947–53 (2003); Bernard Black & Reinier Kraakman, *Delaware's Takeover Law: The Uncertain Search for Hidden Value*, 96 Nw. U. L. Rev. 521, 536 (2002).

[63] Delaware decisions have acknowledged that "a final-stage transaction for all shareholders" is one that warrants application of enhanced scrutiny. *McMullin v. Beran*, 765 A.2d 910, 918 (Del. 2000); *see In re Mindbody, Inc. S'holder Litig.*, 2020 WL 5870084, at *13 (Del. Ch. Oct. 2, 2020) ("The cash-for-stock Merger was a final-stage transaction presumptively subject to enhanced scrutiny under *Revlon*."); *Huff Energy Fund, L.P. v. Gershen*, 2016 WL 5462958, at *13–14 (Del. Ch. Sept. 29, 2016) (explaining that *Revlon* applies in "final stage" transactions because of the inherent conflicts present in such situations); *Chen*, 87 A.3d at 679 ("Delaware decisions have recognized that the standard of review changes to enhanced scrutiny for decisions made during the final period."); *Reis*, 28 A.3d at 458 ("Final stage transactions for stockholders provide another situation where enhanced scrutiny applies."); *Lonergan v. EPE Hldgs. LLC*, 5 A.3d 1008, 1019 (Del. Ch. 2010) ("In a final stage transaction— be it a cash sale, a break-up, or a transaction like a change of control that fundamentally alters ownership rights—there are sufficient dangers to merit employing enhanced scrutiny . . . ."); *In re Pennaco Energy, Inc. S'holders Litig.*, 787 A.2d 691, 704 (Del. Ch. 2001) (applying enhanced scrutiny to "an end-game transaction that represents the final opportunity for Pennaco's stockholders to realize value from their investment in the company"); *Mendel v. Carroll*, 651 A.2d 297, 306 (Del. Ch. 1994) ("[I]f the board were to approve a proposed cash-out merger, it would have to bear in mind that the transaction is a final-stage transaction for the public shareholders. Thus, the timeframe for analysis, insofar as those shareholders are

The fact that a sale of all assets creates a pool of consideration that the Company theoretically could deploy in a new business does not prevent enhanced scrutiny from applying. The stockholders would never again have an opportunity to obtain a return on the capital they invested in the business the Company conducted. And if the Company dissolved, there would not be any ongoing relationship between the Company, its stockholders, and the sell-side fiduciaries. The Sale was an end-stage transaction.

The Comvest Parties are similarly wrong to claim that the business judgment rule applies because of the nature of the Sale. They contend that AdaptHealth provided a package of consideration to the Company that its investors would receive

concerned, is immediate value maximization."); *see also TW Servs., Inc. v. SWT Acq. Corp.*, 1989 WL 20290, at \*7 (Del. Ch. Mar. 2, 1989) (reasoning that *Revlon* applies to a cash sale because "[i]n the setting of a sale of a company for cash, the board's duty to shareholders is inconsistent with acts not designed to maximize present share value, acts which in other circumstances might be accounted for or justified by reference to the long run interest of shareholders. In such a setting, for the present shareholders, there is no long run." (footnote omitted)). *See generally* J. Travis Laster, Omnicare*'s Silver Lining*, 38 J. Corp. L. 795, 804–11 (2013) (discussing final period problem and resulting situational conflicts as justification for the Delaware Supreme Court's otherwise difficult-to-rationalize and much maligned ruling in *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914 (Del. 2003)); J. Travis Laster, Revlon *Is A Standard of Review: Why It's True and What It Means*, 19 Fordham J. Corp. & Fin. L. 5, 8–18 (2013) (discussing final period problem and implications of situational conflicts for *Revlon* as a standard of review); Morgan White-Smith, *Revisiting* Revlon*: Should Judicial Scrutiny of Mergers Depend on the Method of Payment?*, 79 U. Chi. L. Rev. 1177 (2012) (discussing final-stage rationale for enhanced scrutiny); Marcel Kahan, *Paramount or Paradox: The Delaware Supreme Court's Takeover Jurisprudence*, 19 J. Corp. L. 583, 589–602 (1994) (arguing that enhanced scrutiny should apply when stockholders no longer have the ability to reverse the board's decision by electing new directors).

in order of priority—including Comvest as the Company's controller. In *Synthes*, this court held that the business judgment rule would apply when the company engaged in a merger in which all of the company's stockholders received the same consideration.[64]

*Synthes* stands in tension with *McMullin v. Beran*, where the Delaware Supreme Court addressed a sale process where a controlling stockholder ultimately received the same per-share consideration as the minority.[65] The Delaware Supreme Court held that in that setting, enhanced scrutiny applied.[66] In reaching this conclusion, the Delaware Supreme Court recognized that enhanced scrutiny applies not only when a company that previously lacks a controlling stockholder is sold to a controller (as in *QVC*), but also when the sale is a "a final-stage transaction for all shareholders."[67]

"There is no question that, if the Supreme Court has clearly spoken on a question of law necessary to deciding a case before it, this court must follow its

---

[64] *See In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1035 (Del. Ch. 2012).

[65] 765 A.2d at 918–20.

[66] *Id.* at 919; *accord* Mohsen Manesh, *Defined by Dictum: The Geography of* Revlon-*Land in Cash and Mixed Consideration Transactions*, 59 Vill. L. Rev. 1, 24 & n.145 (2014) (noting that *McMullin* "expressly stated that *Revlon* was implicated").

[67] *McMullin*, 765 A.2d at 919.

answer."[68] As between the Delaware Supreme Court's decision in *McMullin* and this court's decision in *Synthes*, the former controls.[69]

Even though a controlling stockholder cannot dock in the safe harbor of the business judgment rule, the fact that a controller did not extract any differential consideration provides powerful evidence that the transaction falls within the range of reasonableness.[70] Applying enhanced scrutiny as the transactional standard of review does not alter the premise that "investors act to maximize the value of their own investments."[71] It remains likely that a controller will bargain for the highest value that it can get, making it likely that the resulting transaction represents the best deal reasonably available for all stockholders. A court can give heavy weight to the views of an aligned controller when assessing whether a transaction satisfies enhanced scrutiny.

---

[68] *In re MFW S'holders Litig.*, 67 A.3d 496, 520 (Del. Ch. 2013), *aff'd sub nom. Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014).

[69] *See Presidio*, 251 A.3d at 263–66.

[70] *Id.* at 266.

[71] *Chen*, 87 A.3d at 670 (internal quotation marks omitted). When a fiduciary owns a material amount of common stock, that interest gives the fiduciary a "motivation to seek the highest price" and a "personal incentive . . . to think about the trade off between selling now and the risks of not doing so." *Dollar Thrifty*, 14 A.3d at 600; *see In re Mobile Commc'ns Corp. of Am., Inc. Consol. Litig.*, 1991 WL 1392, at *9 (Del. Ch. Jan. 7, 1991) (Allen, C.) (noting that directors' substantial stockholdings gave them "powerful economic (and psychological) incentives to get the best available deal"), *aff'd*, 608 A.2d 729 (Del. 1992).

Newton attempts to elevate the standard of review to entire fairness. He does not argue that the Comvest Parties stood on both sides of the transaction, received a non-ratable benefit, or avoided a unique detriment. He instead argues that a breach of the duty of care can elevate the standard of review in a third-party sale setting from enhanced scrutiny to entire fairness.[72]

There is support for that proposition. In *Cede & Co. v. Technicolor, Inc.* ("*Cede II*"),[73] the Delaware Supreme Court examined a third-party sale that was subject to enhanced scrutiny.[74] Chancellor Allen had *assumed* that the directors failed to exercise due care, then relied on *Barnes v. Andrews*[75] to hold that the assumed breach had not proximately caused any damages.[76] On appeal, the Delaware Supreme Court reversed, relied on what it described as the Chancellor's "presumed findings" to hold that the directors had breached their duty of care, rejected the Chancellor's reliance

---

[72] *See* Dkt. 358 (Sellers' Opening Post-Trial Brief) at 60 ("The Comvest Parties' lazy search for capital in the months preceding the sale was grossly negligent at least."); *id.* at 61 ("[B]etween May and September 2020, the Comvest Parties acted with astonishing sloth and indifference."); *id.* at 64 (describing the Sale process as "abysmal").

[73] 634 A.2d 345 (Del. 1993), *decision modified on reargument,* 636 A.2d 956 (Del. 1994).

[74] *Id.* at 361 ("[I]n the review of a transaction involving a sale of a company, the directors have the burden of establishing that the price offered was the highest value reasonably available under the circumstances.").

[75] 298 F. 614 (S.D.N.Y. 1924).

[76] *Cinerama, Inc. v. Technicolor, Inc.*, 1991 WL 111134, at *17 (Del. Ch. June 24, 1991) (subsequent history omitted).

on *Barnes*, and imposed on the directors an obligation to prove on remand that the transaction was entirely fair.[77]

The *Cede II* holding has been criticized for equating a breach of the duty of care with a breach of the duty of loyalty for purposes of establishing the standard of review and for imposing too great a burden on directors when facing a duty of care claim. Chief Justice Strine argued in an opinion written while serving as a Vice Chancellor that if a corporation has an exculpatory provision and if the plaintiff only seeks damages, then a breach of the duty of care should not elevate the standard of review.[78] He offered similar criticisms in a series of articles.[79] The *Cede II* decision also preceded considerable judicial effort to develop the framework for Delaware's three standards of review and recognize enhanced scrutiny as a co-equal standard.

Moving from enhanced scrutiny to entire fairness based on a claimed breach of the duty of care makes little sense. Enhanced scrutiny already incorporates a species of care analysis that examines whether the sell-side fiduciaries followed a process

---

[77] 634 A.2d at 351, 370.

[78] *Goodwin v. Live Ent., Inc.*, 1999 WL 64265, at *24 n.17 (Del. Ch. Jan. 25, 1999).

[79] *See* William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Function Over Form: A Reassessment of the Standards of Review in Delaware Corporation Law,* 56 Bus. Law. 1287, 1301–05 (2001) (examining policy implications of decision); William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Realigning the Standard of Review of Director Due Care with Delaware Public Policy: A Critique of* Van Gorkom *and its Progeny as a Standard of Review Problem,* 96 Nw. U. L. Rev. 449, 460–62 (2002); and Leo E. Strine, Jr. et al., *Loyalty's Core Demand: The Defining Role of Good Faith in Corporation Law*, 98 Geo. L.J. 629, 673–84 (2010) (analyzing decision's reasoning).

that fell within a range of reasonableness. If the defendant fiduciaries fail to make the necessary showing, then a breach of duty exists.[80] Because the enhanced scrutiny standard applies in distinct and easily identified situations, there is no need in that context to start with a business judgment rule analysis and then elevate the standard of review to entire fairness.

Newton also argues that the court should elevate the standard of review from the business judgment rule because the Comvest Parties acted in bad faith.[81] Enhanced scrutiny accounts for the possibility of bad faith conduct as well. "What typically drives a finding of unreasonableness is evidence of self-interest, undue favoritism or disdain towards a particular bidder, or a similar non-stockholder-motivated influence that calls into question the integrity of the process."[82] "[W]hen there is a reason to conclude that debatable tactical decisions were motivated not by a principled evaluation of the risks and benefits to the company's stockholders, but by a fiduciary's consideration of his own financial or other personal self-interests, then the core animating principle of *Revlon* is implicated."[83] But the converse is also

---

[80] *In re Mindbody, Inc., S'holder Litig.*, 2024 WL 4926910, at *1 (Del. Dec. 2, 2024) ("[W]e affirm the trial court's holding that Stollmeyer breached his fiduciary duty of loyalty under *Revlon* by having disabling conflicts and tilting the sale process in Vista's favor for his own personal interests in ways inconsistent with maximizing stockholder value.").

[81] Dkt. 358 at 60.

[82] *Del Monte*, 25 A.3d at 831.

[83] *El Paso*, 41 A.3d at 439.

true. When sell-side fiduciaries and their advisors do not face conflicts of interest and there is no evidence of a bad-faith motive, then a court grants more deference to otherwise debatable decisions during a sale process.[84]

On the facts presented, entire fairness is not the proper standard. The Sale warrants review under enhanced scrutiny, not entire fairness.

### 1. The Process Fell Within A Range Of Reasonableness.

Newton asserts that the process that led to the Sale constituted a breach of duty. He objects that management failed to secure financing that could enable the Company to continue as a standalone entity instead of engaging in the Sale. He also attacks the process that led to the Sale.

### a. The Search For Financing

Newton's attack on the pre-Sale financing efforts fails. The record shows that the Company's efforts fell within a range of reasonableness. Indeed, the Comvest Parties provided the Company with more financing than the Company likely warranted.

A party who controls a company's access to financing can use its control to force the company into a vulnerable position.[85] The Comvest Parties did not do that here.

---

[84] *E.g.*, *Presidio*, 251 A.3d at 267–68.

[85] *See Basho*, 2018 WL 3326693, at \*28–31 (finding that controller used contractual rights to force a company into a financial crisis, then took advantage of the company by imposing an unfair transaction).

Affiliates of Comvest supplied the Company with virtually all of the following financings:

- The First Debt Issuance ($750,000),

- The Second Debt Issuance ($1.75 million),

- The First Preferred Equity Issuance ($2.5 million),

- The Second Preferred Equity Issuance ($1.25 million),

- A Comvest loan to facilitate the sale of the company ($100,000).

The Company also obtained the initial CIBC loan in the amount of $1 million and later an increase in the CIBC loan for another $1 million. The Comvest investment committee also authorized acquiring an additional $1.25 million of Series A Preferred Stock in the Second Preferred Equity Issuance.

Far from forcing the Company into a financial crisis, affiliates of Comvest provided the Company with much-needed financing. Although the Comvest Parties failed to prove that the Challenged Financings were entirely fair, that is a different question than whether affiliates of Comvest provided the Company with sufficient financing to achieve a liquidity event.

Newton responds that the Comvest Parties should have sought—and the Comvest Parties should have provided—another short-term capital infusion so that the Company could extend its efforts.[86] The Comvest Partes had no obligation to

---

[86] Dkt. 358 at 60; Dkt. 385 (Sellers' Post-Trial Reply/Answering Brief) at 43–44.

provide additional funding, and they had already invested a sufficient amount to demonstrate that they acted within a range of reasonableness in supporting a business that was no longer a going concern.[87] The fact that the Comvest Parties were not willing to invest further also made it highly unlikely that other financial sources would step up.[88]

The financing component of the Sale process fell within a range or reasonableness.

---

[87] *See, e.g.*, *Equity-Linked Invs., L.P. v. Adams*, 705 A.2d 1040, 1057 (Del. Ch. 1997) ("[The Series A] were unwilling to put in more money. The preferred is of course not to be criticized for that. They have every right to send no good dollars after bad ones."); *Trados II*, 73 A.3d at 66–67 ("None of the VC firms would put more money into Trados, and they had no obligation to.").

[88] *See Trados II*, 73 A.3d at 77 ("As a practical matter no outside VC firm would invest without participation from the Company's existing backers."); *see also* Josè M. Padilla, *What's Wrong with a Washout?: Fiduciary Duties of the Venture Capitalist Investor in a Washout Financing,* 1 Hous. Bus. & Tax L.J. 269, 279–80 (2001) ("[V]enture capitalists will not invest in a company where existing investors do not participate."); Joseph W. Bartlett & Kevin R. Garlitz, *Fiduciary Duties in Burnout/Cramdown Financings,* 20 J. Corp. L. 593, 601 (1995) ("[O]nce a group of VCs have invested, it is rare that an issuer will have the ability to raise substantial capital unless the existing investors agree to 'play'—continue to invest—in future rounds of financing. . . . [T]he company can be given the putative opportunity to seek alternative sources, but the venture capital community is small and incestuous, with most managers knowing each other. If the company's existing cadre of VC investors is not willing to continue to support the company, then it is unlikely that any new investor will be interested."). For outside VCs to invest without existing investor participation would run the risk of buying a lemon. *See generally* George A. Akerlof, *The Market for "Lemons": Quality Uncertainty and the Market Mechanism,* 84 Q.J. Econ. 488 (1970).

### b. The Search For A Transaction Partner

Newton next contends that the Company botched the search for a transaction partner. "When applying enhanced scrutiny, a court evaluates the sale process as a whole, not just the final decision to sell or the decisions that the directors formally made."[89] The operative question is whether the process fell within a range of reasonableness.

The process that led to the Sale was not ideal. The trial record lacks any evidence indicating that the board members of the Company, Holdings, or Parent other than Black played any meaningful role. The board's skeletal minutes, drafted months after the meetings took place, reference the Sale at a high level, but do not evidence meaningful board involvement. At the same time, a privately held company controlled by a private equity firm may not always observe aspirational standards for legal formalities. Black was on the Board. He doubtless kept the Comvest representatives—his bosses—informed about what was happening.

Black led the sale process and negotiated with McGee. Outside financial or legal advisors were not involved, likely because of the cost. Fairness opinions also are not customary for distressed asset sales.

Black's interactions with McGee carry the hallmarks of arm's-length negotiation. They had no prior relationship. McGee dominated the discussions because he had all of the leverage, not because of a fiduciary breach by Black or the

---

[89] *Columbia Pipeline*, 299 A.3d at 460.

other Comvest Parties. Black's decision not to negotiate over the consideration paid at closing fell within a range of reasonableness. Instead, he negotiated a more favorable earnout. Black and McGee also negotiated over indemnification, representations, and other ancillary matters.

Black was not conflicted during the negotiation process. Newton argued that Black was conflicted while negotiating the Sale because he was bargaining for a larger long-term role at AdaptHealth. At the pleading stage, the court drew this plaintiff-friendly inference and denied the Comvest Parties' motion to dismiss. But the trial record showed otherwise. McGee's original proposal included the terms that "Jonathan Black agrees to 6 month transition agreement for 25K per month and we hopefully discuss longer-term partnership." JX 910 at 1. Black did not propose the consulting agreement. Black did not propose discussing a longer-term partnership. AdaptHealth proposed that Black would be subject to a three-year noncompete after the six-month consulting agreement. JX 2021 at 4. Black believed three years was disproportionate and attempted to increase his consulting agreement to one year. *Id.* He and McGee eventually agreed to keep the consulting agreement to six months but lower the noncompete to one year. *Id.* Black did not compromise his negotiations because of the consulting agreement.

Taking into account that the Company was a distressed asset, the process that led to the Sale fell within a range of reasonableness.

### 2. The Price Fell Within A Range Of Reasonableness.

Enhanced scrutiny requires that the fiduciaries show that the transactional outcome fell within a range of reasonableness. The record at trial satisfied that requirement.

#### a. Breg's Offers

At trial, the Comvest Parties proved that Breg made the only other actionable proposal to buy the Company and that the terms were worse than the Sale. Both Breg offers provide contemporaneous evidence that the consideration in the Sale fell within a range of reasonableness.

Breg made its first offer on July 14, 2020. The offer included a payment at closing of $3.5 million to $5 million, consisting of about 80% in Breg common stock and 20% in cash. Put differently, Breg offered $700,000 to $1,000,000 in cash—about half the AdaptHealth offer—and the rest in Breg securities. The offer also included an earnout potentially increasing the total consideration to $15 million.

Breg based its original offer on information Black sent on June 9, 2020. Any definitive offer was conditioned on due diligence. After receiving Breg's offer, the Company's finances deteriorated. Silverman forecasted that the Company would run out of cash by the end of August or early September. Breg would not have maintained its original offer given the downturn in the Company's performance.

The Company deferred Breg's first offer to pursue the Medium/Long Term Exit plan—securing incremental investment, landing Klosterman to run the Company,

and turning the Company around. That decision fell within the range of reasonableness.

The Company's plan died in early September when Klosterman declined. At that point, on September 15, 2020, Black reached out to Breg, shared updated materials, and reported on the state of the business. Breg responded the next day that he was willing to "take over the contracts" and "provide a soft landing for employees and clients," but there would be no payment for the business. Black Tr. 278–79.

The updated Breg offer confirms that the Company was in desperate straits. Black instead secured the Sale, which represented a superior transaction. That decision fell within the range of reasonableness.

### b.    The Expert Opinions

Both sides relied on experts to value the Company relative to the consideration obtained in the Sale. The Comvest Parties' expert Scott Bouchner sought to show that the Sale price was reasonable. He valued the assets AdaptHealth purchased at $1.14 million, meaning the Sale consideration exceeded the fair market value of the transferred assets. JX 1155 at 31; Bouchner Tr. 1271, 1297–98. Bouchner used a net asset approach because he credibly concluded that the Company was not a going concern as of October 1, 2020. Bouchner Tr. 1304, 1347. Bouchner prepared a credible valuation, and the court takes it into account.

Newton's expert Boris Steffen opined that Bouchner's valuation was not reasonable. Using a discounted cash flow methodology, Steffen opined that the

71

Company's value on the date of the Sale ranged from $44.3 million to $73 million, with a median of $58.7 million. JX 1125 at 19; Steffen Tr. 1173. That figure was preposterous, and the problem stemmed from Steffen's reliance on projections Comvest prepared in May 2018, two years before the Sale closed. Those projections were stale by 2020 and no longer provided a reliable basis for a valuation. In between, the Company had suffered from the CMS audits, the impact of COVID-19, and rapid decline in the Company's business. That Company in October 2020 bore little resemblance to what Comvest thought it was buying in May 2018. Indeed, it was no longer a going concern. The court cannot rely on Steffen's valuation.

### 3. The Conclusion Regarding The Claims Relating To The Sale Process And Sale

The evidence at trial proved that the defendants satisfied their duties under the enhanced scrutiny standard when pursuing and entering into the Sale. Judgment will be entered in the defendants' favor on that issue.

## D. The Fraudulent Transfer Claim

The Seller Representative contends that the Sale constituted a fraudulent transfer. The Seller Representative relies on 6 *Del. C.* § 1304(a)(2) and 6 *Del. C.* § 1305(a), which prohibit transfers that render the debtor insolvent and where the debtor does not receive reasonably equivalent value.[90]

---

[90] The Seller Representative initially pursued a claim that the Sale violated 6 *Del. C.* § 1304(a)(1), which prohibits a transfer made "with actual intent to hinder, delay or defraud." The Seller Representative did not press that claim in its post-trial

"Whether the debtor received 'reasonably equivalent value' depends on '(1) whether the transaction was at arm's length, (2) whether the transferee acted in good faith, and (3) the degree of difference between the fair market value of the asset transferred and the price paid.'"[91] As shown above, Black and McGee negotiated the Sale at arm's length, McGee acted in good faith, and Comvest sold the Company's assets at fair market value. The Sale did not violate 6 *Del. C.* § 1304(a)(2) or 6 *Del. C.* § 1305(a).

## III. CONCLUSION

The defendants largely prevailed on the claims addressed in this decision. Newton established only that (i) one of the Challenged Financings—the Second Debt Issuance—violated Parent's LLC Agreement but that (ii) all three of the Challenged Financings—the Second Debt Issuance and the First and Second Preferred Equity Issuances—were interested transactions subject to the entire fairness test. The defendants then failed to prove that those financings were entirely fair. As a remedy, the court will equitably subordinate the Challenged Financings to the Company's other creditors and to the Seller Note. Otherwise, judgment on the claims that this decision has addressed will be entered in favor of the defendants.

---

briefing. Dkt. 358 at 70–73. Regardless, the trial record contains no evidence suggesting fraudulent intent.

[91] *Seiden v. Kaneko*, 2015 WL 7289338, at *13 (Del. Ch. Nov. 3, 2015) (internal citation omitted).